Carl B. HOITT, Jr., Individually and on behalf of all others similarly situated, et al.

v.

Joseph C. VITEK, Individually and in his official capacity as Warden, New Hampshire State Prison, et al.,

Jaan LAAMAN et al.

v.

Joseph C. VITEK, Individually and in his official capacity as Warden, New Hampshire State Prison, et al.

Civ. A. Nos. 73–55, 73–67.

United States District Court, D. New Hampshire.

Aug. 1, 1973.

Kurt M. Swenson, Wiggin, Nourie, Sundeen, Pingree & Bigg, William H. Kelley, Manchester, N. H., and Richard Cotton, N. H. Legal Assistance, Concord, N. H., for plaintiffs.

David W. Hess, Asst. Atty. Gen., and Thomas D. Rath, Concord, N. H., for defendants.

## OPINION

BOWNES, District Judge.

These are two civil rights class actions brought pursuant to 42 U.S.C. §

1983 in which the plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201 and 2202, injunctive relief, and compensatory and punitive damages for the alleged deprivations, under color of State law, of rights secured to them by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution of the United States. Jurisdiction is based on 28 U.S.C. § 1343(3, 4).

These two cases were consolidated for purposes of discovery and trial. These cases present a class action maintainable under F.R.Civ.P. 23(b)(2). The class consists of all the inmates at the New Hampshire State Prison (hereinafter (NHSP) who are serving sentences imposed after judgments of conviction by the courts of the State of New Hampshire except Richard W. Apostolos.[1]

The defendants, all of whom are sued in their official capacities, consist of the Warden of NHSP, the Governor of the State of New Hampshire, the members of the New Hampshire Governor's Council, and the members of the Board of Trustees of NHSP. Joseph C. Vitek, Warden of NHSP, is also sued individually.

The following four issues, the first two of which allege numerous violations of plaintiffs' constitutional rights, are raised in the amended complaint:

First, it is alleged that the plaintiffs' rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution of the United States were violated by reason of a general prison lockup that started on March 6, 1973. Specifically, it is alleged that the inmates at NHSP were subjected to cruel and unusual punishment as a result of the lockup and were severely punished without due process of law during the lockup.

Second, it is alleged that the involuntary transfer of prison inmates to out-of-state penal institutions without prior notice and hearing, either during or absent an emergency situation, violates the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment prohibition against cruel and unusual punishment.

Third, it is alleged that the plaintiffs' Fourth Amendment rights were violated during the lockup when they were searched and their personal property was seized without a prior hearing, ex parte or otherwise, before an impartial party or tribunal and without a finding of probable cause.

Lastly, plaintiffs contend that any attempt by the defendants to impose disciplinary actions on the plaintiffs as a result of the disciplinary reports prepared during the lockup constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments and double jeopardy in violation of the Fifth and Fourteenth Amendments.

Plaintiffs' motion for a temporary restraining order and/or preliminary injunction was denied on March 19, 1973. Plaintiffs' motion for an immediate end of the lockup was denied on May 1, 1973.

A court trial was held during the week of June 18, 1973.

## I. THE LOCKUP

The following facts have been stipulated.

On March 6, 1973, substantially all of the inmates [2] at NHSP were confined to their cells by defendant Vitek without the advice, consent, or approval of the other defendants. Defendant Vitek telephonically advised defendant Governor

---

1. These class actions were initially brought on behalf of all the inmates at NHSP except those who had deadly weapons in their possession at the time of the general prison lockup. During the lockup which commenced on March 6, 1973, a loaded .38 caliber revolver was found in inmate Apostolos' cell. Mr. Apostolos

specifically requested exclusion from membership in the class on May 3, 1973.

2. It is stipulated that approximately twenty-six inmates or 10% of the prison population were not subject to the lockup. No reason was given for not locking up these twenty-six prisoners.

Thomson on March 6, 1973, after the plaintiffs had been confined to their cells, of the action taken. On or about March 12, 1973, defendant Vitek met with the defendant Governor and the defendant Governor's Councilors and discussed the lockup, and on March 15, 1973, defendant Vitek met with the defendant Board of Trustees of NHSP and discussed it with them. The general prison lockup was put into effect without notice to plaintiffs, without plaintiffs being given the right to consult counsel, without a statement of reasons, without a hearing before an impartial party or tribunal, ex parte or otherwise, and without findings of fact and/or probable cause by such impartial party or tribunal.

During the general prison lockup, plaintiffs were personally searched. Plaintiffs' personal property was inspected, and some of it was seized. One loaded .38 caliber revolver was found in an inmate's cell, and an ice pick, key, and hacksaw blade were found on the top of a door frame in a common cell block area. Defendant Vitek directed the officer in charge of the search not to remove basic health materials and bedding, such as tooth paste, tooth brushes, soap, towels, sheets, blankets, TV's and radios.

From March 6, 1973 to March 17, 1973, all plaintiffs received cereal and milk for breakfast, two meat sandwiches and milk for lunch, and a like diet for dinner. Plaintiffs' counsel, family, and other visitors were not permitted into the prison from March 6, 1973 to at least March 14, 1973. Psychiatrists were not permitted into the prison from March 6, 1973, until at least March 14, 1973, for routine consultations. Some plaintiffs were deprived of in-cell water and toilet facilities when water supplied to sixty-four cells had to be shut off after March 6, 1973 because eight inmates destroyed plumbing facilities in their cells and this resulted in a potential sanitation and flooding problem for a total of sixty-four cells. Running water was restored to all cells by March 10, 1973. Stationary, writing materials, and postage was made available to the plaintiffs free of charge on March 16 and March 18, 1973. On March 19 and March 20, 1973, plaintiffs were removed from their cells for showers, fresh clothes, and clean bedding; this practice was continued thereafter once a week during the lockup. Normal visitation privileges were reinstated for all plaintiffs on March 21, 1973. The lockup ended on May 8, 1973.[3]

That portion of the amended complaint which focuses on the lockup alleges various violations of plaintiffs' rights contrary to the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the Constitution of the United States. The plaintiffs allege: (1) that there was no valid justification for the lockup at its inception; (2) that even if the lockup was initially justifiable, there was not and could not be justification for continuation of the lockup for more than two months; (3) that the conditions during the lockup were tantamount to the infliction of cruel and unusual punishment upon the inmates; (4) that during the lockup a variety of specific constitutional rights were abridged, to wit: the inmates were denied the right to counsel for nine days, were denied their First Amendment rights to writing and reading materials for approximately ten to twelve days, were denied their First Amendment right to practice their religion by attendance at church services for some six weeks, and were subjected to cruel and unusual punishment specifically through the refusal to administer needed medical supplies and generally through being locked in their cells without exercise,

---

3. Approximately eighty plaintiffs were released from the lockup on March 26, 1973. Another twenty-five plaintiffs were released on March 27, 1973. An additional eight plaintiffs were released from the lockup on March 28, 1973. Approximately 10% of the plaintiffs were still confined to their cells on May 1, 1973.

without showers, without proper hygienic materials, without adequate food, and without rehabilitative activities for periods ranging from one week to two months; and (5) that the lockup was instituted without a statement of reasons, without a hearing before an impartial tribunal, ex parte or otherwise, and without probable cause to believe that such a lockup was necessary.

These various allegations tacitly acknowledge that a lockup may be instituted to maintain prison security in an emergency situation because it is specifically alleged that the lockup was not justified, that no emergency situation as to prison security existed, and that the lockup was instituted by the Warden to appease the prison guards. See Part IV, Section A, Paragraphs 9–12, 15–16, 20, 22, 24, 26, 28, 30, 36–37, 39–41, 43–44, and 58–59 of the amended complaint.

The defendants have moved to dismiss the allegations relative to the lockup contained in Part IV of the amended complaint for failure to state a claim upon which relief can be granted. F.R. Civ.P. 12(b)(6).

This case appears to be one of first impression on the question of a general prison-wide lockup. Plaintiffs have cited no authority and extensive research by the court has disclosed no existing precedent which considers and decides the constitutional issues raised here.

■ I rule that the allegations in Part IV of the amended complaint, considered in the light most favorable to the plaintiffs, do not state a claim entitling them to relief. This ruling is based on three grounds: (1) the War-

den stated that the lockup was necessary to meet an emergency situation; (2) the conditions in existence during the lockup applied equally to all of the prison inmates; and (3) the alleged deprivations suffered by all of the inmates at NHSP were temporary in nature and were in the Warden's judgment required for security reasons.

■ 1. The lockup was instituted by the Warden based on his professional belief that an emergency existed at the State Prison which threatened the security of that institution. It is not within the province of a court to second-guess the judgment of corrections officials by deciding after the fact whether a lockup was, in fact, justified. Since such a determination requires a judgment as to the Warden's capabilities of assessing and resolving security difficulties at the prison, it should be made by an independent commission or legislative committee. This deference to the judgment of prison officials in perceiving what they consider to be an emergency situation and unilaterally acting to quell or prevent it has been recognized by the federal judiciary and reflects a proper understanding of a prison's need for discipline, safety, and security. *See, e.g.,* Gomes v. Travisono, 353 F.Supp. 457, 469 (D.R.I.1973); Biagiarelli v. Sielaff, 349 F.Supp. 913, 917 (W.D.Pa. 1972); Bowers v. Smith, 353 F.Supp. 1339, 1344, (D.Vt. 1972).

By statute, the Warden of NHSP is directly responsible for the security of the prison and the safety and welfare of all inmates and administrative personnel.[4] The ultimate responsibility

---

4. NH RSA 622:5 provides in pertinent part as follows:

*Powers of Trustees.* The trustees, subject to the supervision and direction of the governor and council, shall have power:

I. To appoint all officers and servants necessary for the management of the prison, and to remove them, subject to the regulations of the state personnel commission.

II. To define the powers, duties, and compensation of such officers and

agents, subject to the regulations of the state personnel commission.
\* \* \* \* \*
NH RSA 622:7 provides in pertinent part as follows:

*Duties of Warden.* It shall be the duty of the warden:

I. To receive, safely keep, and employ in the prison all convicts pursuant to their sentence and until discharged according to law. . . .

II. To have the custody and superintendence of all persons confined in

of running NHSP lies with the Warden, the Governor and Council, and the Board of Prison Trustees. Since the appropriate prison officials believed that there was an emergency situation at NHSP on March 6, 1973, which required a prison-wide lockup, the action taken even if not based on substantial reliable evidence, cannot now be reviewed under the guise of a civil rights action. See Gomes v. Travisono, *supra*, 353 F.Supp. at 469. To penalize a prison official for prison-wide action taken in what he considered to be an emergency situation would be to effectively shackle any future attempts by a prison warden to deal with an emergency or crisis situation, and a serious and tragic uprising like that which occurred at Attica might well be the result.

■ 2. The lockup which was instituted as an emergency measure affected *all* of the inmates. There is no doubt that the inmates' confinement to their cells was tantamount to punishment and that the inmates lost their normal privileges during the lockup. If one, or even a group, had been singled out for such treatment without a prior hearing, then this court would not hesitate to act. See Collins v. Hancock, 354 F.Supp. 1253 (D.N.H.1973). While the Eighth Amendment's prohibition against cruel and unusual punishment is not limited to instances in which a particular inmate is subjected to a punishment directed at him as an individual, see Holt v. Sarver, 309 F.Supp. 362, 372–373 (E. D.Ark. 1970), aff'd 442 F.2d 304 (8th Cir.1971), inmate confinement during an *emergency* situation stands on a different footing. Prison security is a matter for prison officials. All of the cases dealing with prisoners' rights contain the phrase "absent an emergency situation," or "except where prison security is threatened," or "subject to the needs and requirements of prison security and discipline," or apply the "clear and present danger" test. *E.g.*, Biagiarelli v. Sielaff, *supra*, 349 F.Supp. at 917; Gomes v. Travisono, *supra*, 353 F.Supp. at 469; Bowers v. Smith, *supra*, 353 F. Supp. at 1344. The case at bar falls squarely within the emergency exception, and it should be noted that plaintiffs have made no allegations that any of the prison guards used the prison-wide lockup as a "cover" for cruel and abusive treatment against individual prisoners.

■ 3. The specific constitutional deprivations complained of by the plaintiffs were experienced by *all* of the inmates at NHSP. Virtually all of the deprivations were terminated in less than two weeks. The gradual ending of the lockup commenced as soon as the search of the prison and personal effects of the prisoners had been completed. Prison officials are justified for security reasons during an emergency to *temporarily* curtail rights and privileges normally afforded prisoners and to proceed with a shakedown of the prison.

■ Moreover, it does not appear that the determination of whether or not the lockup was, in fact, justified will have any positive results. The lockup ended on May 8, 1973. Certainly, if the Warden made a good faith judgment, even though mistaken, he should not be held liable in damages. It is not the province of a court to determine the competency of the Warden as an administrator of a prison; that responsibility lies with the duly appointed and elected State officials.

The courts, and particularly federal courts, can protect the rights of individuals in prison, and this court has not hesitated to do so when the occasion properly arose. But any court is ill-equipped to engage in day-to-day scrutiny of the operation of a prison or to try to define disciplinary situations, security measures, and emergency conditions that

the prison, and of all property belonging thereto.

III. To obey and enforce all orders, by-laws, and regulations which may

be made by the trustees for the management of the prison.

\*　　\*　　\*　　\*　　\*

would or would not justify a general lockup.

Part IV of plaintiffs' complaint is dismissed for failure to state a claim upon which relief can be granted. F.R.Civ.P. 12(b)(6). This dismissal is, of course, without prejudice to the rights of any individual who may have been subjected to constitutional violations different in kind or degree than those generally suffered by all of the inmates at NHSP during the lockup to bring a civil rights action predicated on such individual violations.

## II. THE TRANSFER

On March 17, 1973, nine of the named plaintiffs were involuntarily transferred from NHSP to the United States Penitentiary in Lewisburg, Pennsylvania, without notice, without a statement of reasons, without opportunity to consult with counsel or contact family, without a hearing before an administrative tribunal, and without findings of fact by such a tribunal. These transfers precipitated this civil rights action challenging the constitutionality of involuntary out-of-state transfers *per se* and of the procedures under which such transfers are accomplished.

Specifically, the plaintiffs contend that involuntary removal of a prisoner from New Hampshire who was sentenced under New Hampshire law, even after a full and fair hearing, violates the Eighth Amendment's ban on cruel and unusual punishment. Alternatively, plaintiffs argue that an involuntary interstate transfer without prior notice and hearing violates the Due Process Clause of the Fourteenth Amendment. It is claimed that transfers outside the State of New Hampshire which are effected without access to counsel and without an opportunity to confront their accusers, violate the First, Sixth, and Fourteenth Amendments. Plaintiffs further contend that the decision to transfer inmates on March 17, 1973, was without basis in fact and constituted arbitrary and capricious action in violation

of the Fourteenth Amendment. Lastly, plaintiffs contend that any attempt by the defendants to punish them after their return to New Hampshire on the basis of the disciplinary reports prepared during the lockup and prior to their transfer constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments and violates plaintiffs' right to be free from double jeopardy as guaranteed by the Fifth and Fourteenth Amendments.

### A. THE FACTS

Reconstruction of the events leading to the transfers is not difficult; reconstruction of the true causes of the transfers is uncertain; reconstruction of what actually was happening at NHSP prior to March 17, 1973, is well nigh impossible.

On March 6, 1973, the Warden of NHSP declared a state of emergency and instituted a general prison lockup. Prior to the initiation of the lockup at NHSP, eight of the nine transferee plaintiffs were in the general prison population; Edward McMillan had arrived at NHSP on March 6, 1973, and was immediately placed in administrative quarantine and segregation for classification purposes, a routine procedure for new arrivals at NHSP which customarily last for seven to fourteen days. Between March 6 and March 17, plaintiffs Laaman and Cormier were placed in maximum security solitary confinement at NHSP for their conduct during the lockup.

Warden Vitek testified that sometime between March 6 and March 9, he first recognized the need to transfer some of the inmates at NHSP to other penal institutions. On March 13 the Warden made a report to the Governor and the Executive Council concerning the emergency situation at NHSP and the ongoing lockup. At that time the Governor and Council voted "to transfer $5,000 from the Emergency Fund to the State Prison appropriation to remove present trouble makers [sic] to a federal

penitentiary." Deft.'s Ex. A. On March 14 the Warden contacted the Director of Corrections, Federal Bureau of Prisons and secured the requisite authority to transfer up to ten inmates from NHSP to federal penal institutions.[5] On or about March 15 arrangements were completed for the transfer of ten inmates from NHSP to the United States Penitentiary in Lewisburg, Pennsylvania. No effort was made to transfer prisoners to any of the other New England states despite the existence of the New England Interstate Corrections Compact,[6] nor were any attempts made to transfer prisoners to any county jail or house of correction within New Hampshire.[7] The transfer of plaintiffs to Lewisburg by the defendants was pursuant to NH RSA 623:1.[8] Although the statutory authority for the transfers is not crystal clear, by any interpretation, I assume for purposes of this opinion that the transfers were legal.

In deciding whom to transfer, the Warden stated that he relied heavily on staff consultations. The primary reason for selecting nine of the named plaintiffs for transfer was their activities during the lockup, i.e., from March 6 through March 16. The prison guards were told to record all infractions of prison rules that they observed, and information contained in the disciplinary reports (Pl. Ex. 2) allegedly documenting the activities of the prisoners during the lockup were utilized by the Warden in making the determination of whom to transfer. The Warden testified that secondary consideration was also given to the past record and prior behavior of the prisoners. The Warden stated that all of the transferees, in his opinion, posed a threat to the security of NHSP.

Each of the transferred prisoners who testified stated that most, if not all, of the information contained in the disciplinary reports were false. They further stated that they would have responded to the allegations contained in these disciplinary reports if they had been given an opportunity to do so. The transferred prisoners were never given copies of the disciplinary reports, either before or after their transfer. It is stipulated that the prison officers who signed the various disciplinary reports pertaining to the transferred inmates would testify as to the truth of the contents of said reports.

---

5. The transfer of these inmates was pursuant to an agreement entered into between the Government of the United States and the State of New Hampshire whereby the State would reimburse the United States Government in full for the cost of maintaining state prisoners at federal institutions. 18 U.S.C. § 5003 authorizes the United States Government to enter into contracts for the custody of state prisoners.

6. NH RSA 622-A provides in pertinent part as follows:

\* \* \* \* \*

*Article III*
*Contracts*
(a) Each party state [Maine, New Hampshire, Vermont, Massachusetts, Connecticut, and Rhode Island] may make one or more contracts with any one or more of the other party states for the confinement of inmates on behalf of a sending state in institutions situated within receiving states. . . . .

7. NH RSA 623:2 provides as follows:
*Transfer from State Prison.* Any person confined in the state prison, may upon recommendation of the warden, and with the approval of the governor, or a justice of the superior court, be transferred to a county jail or house of correction.

8. NH RSA 623:1 provides as follows:
*Illness, etc.* Any person confined in a county jail, house of correction, state prison, or other place of detention may, under such precautions and for such time and purpose as any justice of the superior court or the governor may order, be temporarily taken by some regular or specially authorized officer from such place of detention because of his own extremely critical illness, or the imminently approaching death, or the funeral of a member of his immediate family, or for such imperative and extraordinary purpose as shall be deemed justifiable and humane by said justice, or the governor, to whom application is made.

The Warden testified that the transfer of these inmates was a temporary measure designed to diffuse the tense situation within the prison during the emergency lockup and to make more cell space available for the remaining inmates at NHSP. He said the purpose of the transfer was not punishment. The Warden knew that the transferred prisoners would eventually have to be brought back to NHSP, but he did not know when they would return. Warden Vitek stated that he was advised prior to the transfers of the recent court decisions in Rhode Island [9] and Massachusetts.[10] The Warden also stated that the transferees could not have been segregated and kept at NHSP because there was insufficient cell space in the Annex for segregation, insufficient staff to properly supervise the Annex, and inadequate security in the Annex area of the prison. This was disputed by the plaintiffs.

No advance notice of the decision to transfer or of the destination was given to the plaintiffs. The Warden stated that notice of the decision to transfer might lead to disruption within the prison and physical attacks on prison guards and notice of where the inmate was being sent might increase the security risks accompanying the journey. On March 17, 1973, the plaintiffs were summarily removed from their cells, handcuffed, strip-searched, given a pair of underware, trousers, T-shirt, and sox, placed in a police van, and transported to the Federal Penitentiary in Lewisburg, Pennsylvania. The inmates were transferred without their personal property.[11] Accompanying each transferee was a transmittal summary prepared by an official at NHSP and his mittimus.

The transmittal summaries (Pl. Ex. 3) that accompanied each of the transferred inmates were prepared on the evening of March 16 by Associate Warden Clark at the request of the Federal Bureau of Prisons. These transfer summaries were the only documents with the exception of the mittimus that were forwarded to the receiving penal institutions. No psychiatric reports were forwarded to the federal institutions except in the case of Robert Auger upon specific request by the appropriate federal corrections officials. Each of the inmates who testified at the hearing stated that there were major inaccuracies contained in the transmittal summaries and that they would have responded to and rebutted the information contained therein if given an opportunity. The transmittal summaries become a part of each inmate's prison record.

All nine of the named plaintiffs were initially transferred to Lewisburg, Pennsylvania. A common pattern emerges from the stories of each of the transferred inmates. Upon arrival at Lewisburg, they were placed in administrative quarantine segregation except for plaintiff West who was immediately admitted to the prison hospital. Placement in quarantine segregation is a routine procedure at Lewisburg for all new arrivals whereby such persons are generally confined to their cells and required to conform their personal appearance to prison standards pending their classification and introduction into the general prison population.

Quarantine segregation consists of five stages. Commitment to and movement within the stages is within the power of an Adjustment Committee, which meets three times a week. Classification within quarantine and movement within the five stages of segregation is based upon the information which the prison officials at Lewisburg receive regarding each of the transferred inmates and the conduct of the transferees at Lewisburg.

9. Gomes v. Travisono, 353 F.Supp. 457 (D.R.I. 1973).

10. Barrett v. Boone, Civil No. 73–81–G (D.Mass. Jan. 26, 1973).

11. Eventually letters were sent to the transferred inmates from officials at NHSP inquiring as to what the transferees wanted done with their personal property.

All prisoners received at Lewisburg are placed in Stage I of quarantine segregation upon their arrival at that institution. Stage I consisted of confinement to a closed strip cell without windows, a mattress on the floor,[12] a toilet, a sink with a cold water faucet which cannot be controlled from within the cell, and a single sheet and blanket. Stage I is customarily reserved for prisoners presenting the most serious disciplinary problems.

After a short period of confinement to Stage I, each transferee was brought before the Adjustment Committee for an interview. During the interview, each transferee was usually asked why he had been transferred to Lewisburg. Prison officials generally did not believe the responses of the transferees to the effect that they did not know the reasons for their transfer. The Adjustment Committee then proceeded to make reference to the transmittal summaries which contained information about each particular transferee. It is evident that the members of the Adjustment Committee relied heavily on the information contained in the transmittal summaries and, in general, regarded the transferees as "troublemakers."

After approximately one week, most of the plaintiffs were moved to Stage II within the quarantine segregation unit. In Stage II the strip cell had windows, a bed and a mattress, a full complement of sheets and blankets, a toilet, and a sink with a water faucet which could be controlled from within the cell. Stage II is a level within segregation customarily reserved for those prisoners presenting the more serious disciplinary problems.

In Stages III, IV, and V, additional privileges were granted to the inmates. In Stage III, the prisoners have earphones so as to enable them to listen to the prison's closed circuit music system, are entitled to have library books, magazines, and newspapers from the prison library, and are issued smoking materials. Stage III is also used at Lewisburg for pretrial confinement of federal prisoners charged with serious, violent crimes. In addition to the privileges granted in Stage III, Stage IV confinees are issued chairs and lockers, and are entitled to make purchases from the prison commissary. Stage IV is customarily reserved for disciplinary purposes, long-term pretrial confinees, and prisoners segregated for protective custody. Stage V is merely an "overflow" section for Stage IV. Prisoners confined in Stages IV and V have all the rights of the general prison population except for restriction on their right to travel within the prison. After completion of Stage IV or V and after having been given a haircut, an inmate is released to the general prison population.

Prior to their being released to the general prison population at Lewisburg, eight of the nine named plaintiffs (excluding Laaman) were transferred from Lewisburg to other correctional institutions within the federal penal system.[13] These plaintiffs were routinely placed in segregated quarantine status at the receiving institutions for various periods of time up to two months. All of the

12. George Baker, Special Intelligence Supervisor for the United States Department of Corrections, testified that in Stage I there were only three cells that did not contain beds as well as mattresses. Jaan Laaman was confined in Cell Number 114 which did not contain a bed.

13. Charles Parker, Jr., was transferred from Lewisburg to Terre Haute, Indiana, to Leavenworth, Kansas. Edward McMillan was transferred from Lewisburg to Terre Haute to Marion, Illinois, and then back to Lewisburg. Ronald Cormier was transferred from Lewisburg to Terre Haute to Leavenworth. Richard Williams was transferred from Lewisburg to Terre Haute. Bernard Page was transferred from Lewisburg to Terre Haute to Leavenworth to Springfield, Missouri, and then back to Leavenworth. James DeCosta was transferred from Lewisburg to Atlanta. Roger Auger was transferred from Lewisburg to Terre Haute to Leavenworth to El Reno, Oklahoma, and then back to Lewisburg. William West was transferred from Lewisburg to Atlanta. No reason was given for these "tours" of widely scattered federal institutions.

plaintiffs were permanently returned to NHSP on or before July 3, 1973.[14]

A great deal of testimony was devoted to describing the conditions of confinement, the programs and treatment that was afforded individual inmates, and the rules and regulations that govern prison life at NHSP prior to transfer and at Lewisburg and other federal penal institutions after transfer. This testimony was elicited to show the impact that transfer has on the life of a prisoner, and can be fairly categorized and summarized as follows: (1) job training and work programs; (2) educational and rehabilitative programs; (3) visitation; (4) access to counsel and courts; (5) mail and literature; (6) psychiatric and medical treatment; (7) inmate friendships; (8) effect on parole; and (9) psychological impact. I now treat each category in detail.

(1) *Job training and work programs.* These are severely interrupted by transfer. Most, if not all, of the plaintiffs were working in various industries or jobs within NHSP and were earning seventy-five cents per day for their labors prior to transfer. Some of the plaintiffs were also engaged in on-the-job training and/or vocational rehabilitation programs at NHSP prior to transfer. During most of their confinement at the various penal institutions, the transferees were confined in quarantine and were not allowed to work. Those plaintiffs who were released to the general prison population were often placed in work assignments not consonant with their prior job training or their individual development. Furthermore, the transferred inmates were not paid for the work that they did during their confinement out-of-state. The funds in the personal savings of the plaintiffs which had been earned through work at NHSP were trans-

ferred to the federal institutions after considerable delay.

(2) *Educational and rehabilitative programs.* Generally, the educational and rehabilitative programs at the receiving institutions were not made available to the transferred inmates. Prior to transfer, some of the plaintiffs at NHSP were participating in educational programs offered by Franconia College and the University of New Hampshire. These programs were interrupted by the involuntary transfers. Inmate DeCosta testified that a state prisoner confined in a federal penitentiary is in a "limbo" status and, accordingly, is treated worse than a federal prisoner. He stated that if state prisoners wished to participate in educational or rehabilitative programs at Atlanta, they were placed at the bottom of the list for admission to whatever programs were offered. On the other hand, Gerald Lacattiva, Case Management Coordinator at Lewisburg, testified that vocational training and rehabilitative programs are available at Lewisburg for state prisoners.

(3) *Visitation.* Transfers effectively curtail visits from family, relatives, and/or friends. Most of the plaintiffs received regular visits from friends and relatives at NHSP prior to transfer. Pl. Ex. 13. None of the plaintiffs except Laaman received visits while confined in the various federal institutions. This can be attributed not only to the greater distance separating the inmates from their family and friends, but also to the fact that neither the inmates nor their family were given advance notice of the transfer itself or the places to which they were being transferred.

(4) *Access to counsel and courts.* The transferred inmates suffered hardships with regard to pending court proceedings. At the time of the March 17 transfers, four of the transferred in-

---

14. One hundred and eight days elapsed from the time that the plaintiffs were initially taken from NHSP until they were all permanently returned. It should be noted that much of the delay in securing the return of the plaintiffs to New Hampshire, pursuant to an order of this court, was due to the inability of the appropriate prison officials to locate all of the plaintiffs within the federal corrections system and the red tape within the prison bureaucratic structure.

mates had federal or state charges pending against them and one had an appeal pending. Their transfer out-of-state seriously interfered with their right to consult with their New Hampshire counsel concerning the pending criminal charges against them. In at least two instances cases had to be continued contrary to the transferee-defendant's desire for a speedy trial because he was without the State of New Hampshire and was not brought back to stand trial as scheduled.

(5) *Mail and literature.* Generally, mail censorship regulations at the receiving institutions were more stringent than those at NHSP. During their confinement in Stage I of quarantine at Lewisburg, some of the inmates were not allowed to send mail out. In at least one instance, letters were censored and returned with the notation that the subject matter of the letters which had been written was not acceptable for transmittal. Communication with counsel was impeded in that counsel were not notified of the transfers. Access to literature and reading material was prohibited during Stages I and II of quarantine segregation at Lewisburg.

(6) *Psychiatric and medical treatment.* Several of the plaintiffs were denied medications which had been prescribed for them by psychiatrists and/or doctors after their transfer to federal institutions. In most instances the medications which were not provided to the transferee were tranquilizers which had been prescribed by the prison psychiatrist at NHSP. In one case, however, medications prescribed for an ulcer were denied. In addition, one of the plaintiffs stated that his repeated request to see a psychiatrist while confined in federal prisons was denied. It is fair to conclude that the failure to forward psychiatric reports to the receiving institutions is likely to impede the rehabilitation of the transferred inmates.

(7) *Inmate friendships.* Transfer *per se* necessarily causes physical separation of the transferred inmate from his friends at NHSP. Many of the transferees had difficulties in adjusting to their new environments not only because they were initially placed in quarantine segregation at each of the receiving institutions, but also because they had to make new friends and to adjust to new inmate populations and prison conditions. Frequently, the transferred inmates were met with hostility from inmates at the receiving institutions because the transferees were thought to be informers or "stool pigeons" who were transferred for protective reasons.

(8) *Effect on parole.* Out-of-state transfer has an adverse effect on an inmate's parole chances. Appearance by an inmate at his parole hearing is very important. Usually, transferred inmates would not be able to make an appearance before the parole board, and it is extremely likely that the lack of presence of an inmate would be detrimental to him. A transferred inmate also has difficulty in preparing his home and job plans because his ties to his family and to his community have been weakened by interstate transfer. Transfer also reduces the opportunity an inmate has to participate in a rehabilitative program which is an important factor to the parole board. The mere fact that an inmate has been transferred is likely to be put into the report which goes to the parol board. The transmittal summaries, which accompanied the transferred inmates, also become part of the permanent file of an inmate which, I assume, is available for consideration by the parol board.

(9) *Psychological impact.* Through testimony of an expert witness, Dr. Frank Rundle, the plaintiffs have elicited testimony that out-of-state transfer *per se* has a detrimental effect on the rehabilitation of an inmate. In summary, it is Dr. Rundle's opinion that involuntary transfer can never be beneficial to the transferred inmate, even if the conditions of confinement at the receiving institution are better than those existing at the institution from which he was sent. Transfer of an inmate away from his community is destructive of

the positive reinforcement an inmate receives from family and friends; it ruins relationships with inmate peers and it interrupts educational, vocational, and rehabilitative programs. Dr. Rundle testified that involuntary transfer without notice and without an opportunity to be heard creates in the mind of the transferred inmate a sense of injustice and resentment which can only lead to a state of sustained bitterness and anger which ultimately is transmuted into "declared and intended vengeance against society." The effect of continual transfers, which most of the plaintiffs were subjected to, is creation of a state of anxiety and anger which causes the transferred inmate to lose all sense of the future and to enter a state of almost nonexistence.

Dr. Rundle also testified concerning the lockup. He stated that it was predictable that the type of behavior which was written up in the disciplinary reports (Pl. Ex. 2) will occur whenever a general prison-wide lockup is suddenly instituted without explanation. He said that a permanent destructive effect on every prisoner can be expected as a result of the lockup.

Dr. Charles Saltzman, a psychiatrist, testified that while involuntary transfer is a traumatic experience, it generally does not result in permanent psychiatric or psychological damage to the transferred inmate. He stated that involuntary transfers can be expected to produce anxiety reactions, which often result in an "acting out" of anger by the transferee prisoner, and that the duration of such temporary psychiatric damage varies with each individual prisoner.

Dr. Henry Payson, a psychiatrist who is now working on a program relative to disturbed offenders at the prison, testified that temporary psychiatric disturbance is a definite result of involuntary transfer, but that the permanent effect of such a transfer on an inmate has not yet been determined. Dr. Payson stated that although involuntary transfer is destructive and undermines the dignity of the individual being transferred, the real harm comes about by not giving the individual inmate any due process safeguards prior to transfer. He expressed his views on this point as follows:

. . . [A]nytime that you do something to a person and do not allow him to participate in a verbal transaction with you, no matter what the outcome, that the effect of what you do is going to be more destructive than it would be if you allowed him the opportunity to even say a few last words before he is executed.

Transfer itself has no effect on an inmate's sentence. The Warden at NHSP stated that statutory and meritorious "good time" are calculated in advance and that only disciplinary action for infraction of prison rules and regulations can result in a reduction of statutory and/or meritorious "good time." Warden Vitek testified that transfer was not considered as punishment or disciplinary action and, therefore, there was no deduction of "good time" credits from the sentences of the transferred plaintiffs.

Warden Vitek testified that in making the decision to transfer these nine plaintiffs, he had to weigh the rehabilitation of the two hundred and forty remaining inmates at NHSP versus the rehabilitation of the transferees. He also stated that had these plaintiffs not been transferred, they would have remained locked-up in their cells throughout the lockup and would have been the last ones to have been released.

### B. FINDINGS AND RULINGS

Plaintiffs contend that involuntary out-of-state transfer in and of itself violates the Eighth Amendment's prohibition against cruel and unusual punishment. I disagree.

Cruel and unusual punishment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). See also Furman v. Georgia, 408 U.S. 238, 329, 92 S.Ct. 2726, 33 L.Ed.2d 346 (J. Mar-

shall) (1972). Taking into consideration the fact that society has, to some extent, progressed in terms of its sensitivity, compassion, and concern for human dignity, we have not yet reached that stage of progress that justifies a finding that involuntary out-of-state transfer of a convicted prisoner is either cruel or unusual punishment. Gomes v. Travisono, 353 F.Supp. 457, 465 (D.R.I. 1973).

Certainly the confinement of federal prisoners in institutions far from home is not unusual. The discretion vested in the Attorney General of the United States under 18 U.S.C. § 4082 to confine federal prisoners in any suitable and appropriate place was upheld by the First Circuit Court of Appeals against an Eighth Amendment challenge in Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969). The federal transfer statute, 18 U.S.C. § 5003, providing that the Attorney General of the United States, when the Director shall certify that proper and adequate treatment facilities and personnel are available, is authorized to contract with proper officials of a state for custody, care, subsistence, education, treatment, and training of persons convicted of criminal offenses in the courts of such state, has also withstood constitutional attack. Duncan v. Madigan, 278 F.2d 695 (9th Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1096, 6 L.Ed.2d 242 (1961), reh. denied, 366 U.S. 947, 81 S.Ct. 1675, 6 L. Ed.2d 858 (1961), cert. denied, 368 U.S. 905, 82 S.Ct. 185, 7 L.Ed.2d 99 (1961). See also Dwyer v. State of Alaska, 449 P.2d 282 (Alaska 1969). It is difficult to envision how state prisoners are entitled to greater protection under the Eighth Amendment than federal prisoners. Considering the fact that 18 U.S.C. § 5003 expressly authorizes the confinement of state prisoners in federal institutions when certain preconditions are met, and that such arrangement has been utilized by states other than New Hampshire,[15] I find that confinement of state prisoners in federal penal institutions is not unusual.

Nor do I find transfers to be cruel in the constitutional sense. While transfers are certainly onerous and may even be tantamount to punishment, they are not, *per se* degrading to the dignity of human beings, barbarous, excessive, or without a legitimate purpose. While it may be that the conditions under which a given transferee is confined do themselves violate the Eighth Amendment, it cannot be said that involuntary interstate transfers are constitutionally forbidden under the Eighth Amendment.

But the procedures and practices under which involuntary transfers are effectuated may well violate the Due Process Clause of the Fourteenth Amendment.

■ As evidenced in the case at bar, involuntary interstate transfers have a punitive effect on the transferred inmates. Transferees are routinely placed in quarantine segregation at the receiving institution without receiving the due process protections afforded inmates who are put in segregation at NHSP for disciplinary violations. See Collins v. Hancock, 354 F.Supp. 1253 (D.N.H. 1973). The law is clear that the basic guarantees of fairness must precede punishment. Nolan v. Scafati, 430 F.2d 548, 550 (1st Cir. 1970); Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971).

The evidence also shows that transfer radically transforms an inmate's life. Involuntary out-of-state transfer subjects an inmate to several severe deprivations. He is effectively cut off from his family and friends. His work, job training, and educational and rehabilitative programs are interrupted. Transfer seriously burdens an inmate's access to counsel and the courts and impairs his parole chances. Psychiatric and medical treatment may be temporarily curtailed. A transferee is generally

---

15. Gomes v. Travisono, 353 F.Supp. 457 (D.R.I.1973); Barrett v. Boone, Civil No. 73–81–G (D.Mass. Jan. 26, 1973); and Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972).

branded a troublemaker and treated as such without being given an opportunity to defend himself and refute such a "reputation." Furthermore, the psychological effect of involuntary interstate transfer is damaging to the inmate and impeded any effort to rehabilitate him. In no case is there evidence that transfer enhanced an inmate's prospects of rehabilitation.

■ ■ While a prisoner does not have a vested right to remain in the institution to which he was originally committed, this is not dispositive of the constitutional issue presented. The determination of whether due process requirements apply depends upon a determination of the nature of the interests being infringed, not upon a weighing of the competing interests of the parties. Board of Regents v. Roth, 408 U.S. 564, 570–571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is evident that involuntary interstate transfers have a punitive effect on the transferred inmates and involve an infringement of liberty and, to some extent, a loss of property. These interests are not insubstantial. As Judge Pettine in Gomes v. Travisono, *supra*, so aptly stated:

> Whether the decision to transfer is based on a disciplinary violation, security requirements, or the rehabilitative interests of the particular inmate, the decision is based upon some perceived facts about the inmate and his behavior. The consequences of an erroneous preliminary determination of these facts is an infringement of liberty and imposition of hardship on innocent persons. 353 F.Supp. at 467.

Thus, whatever the state's interest, procedural due process requirements must be met in involuntary interstate transfers because of the adverse effects such transfers impose on the inmates. Gomes v. Travisono, *supra*; Barrett v. Boone, Civ.No. 73–81–G (D.Mass., Jan. 26, 1973); Capitan v. Cupp, 356 F.Supp.

302 (D.Or.1972). *But see* Hillen v. Director of Department of Social Service and Housing, 455 F.2d 510 (9th Cir. 1972), cert. denied, 409 U.S. 989, 93 S. Ct. 331, 34 L.Ed.2d 256 (1972).

In determining what forms of process are due, it is appropriate to weigh the interests of the parties. Board of Regents v. Roth, *supra*, 408 U.S. at 570, 92 S.Ct. 2701. The Warden's concern that security risks for the journey of the inmate to the new institution would be enhanced by prior notice of the transfer relates only to the time of transfer and the exact destination. No such security risks are involved in a notice of a recommendation to transfer. As to the State's argument that notice and hearing would be an undue administrative burden, I find this unpersuasive and of little substance. Involuntary interstate transfers are not a frequent occurrence.[16] The Warden has stated that these nine plaintiffs have been brought back permanently to NHSP and that no future transfers are contemplated. Notice and hearing are required before imposition of punishment at NHSP, Collins v. Hancock, *supra*, and I fail to understand how extending such procedures to transfers would be unduly burdensome. Furthermore, no reasons have been advanced why hearings could not be held prior to transfer absent an emergency situation. The Warden's fears that notice of a large number of transfers might lead to disruption in the prison do not apply to the case of an isolated transfer of a single inmate. A large number of transfers at once, as occurred in the case at bar, is foreseeable only in emergency situations when special rules would apply. Gomes v. Travisono, *supra*, 353 F.Supp. at 468–469. See also Roberts v. Pepersack, 256 F.Supp. 415, 432 (D.Md.1966).

Furthermore, the State has, absent special circumstances, an interest in affording due process protections to inmates. The State is vitally concerned

---

16. There had been only one involuntary out-of-state transfer prior to the March 17, 1973, transfers. On June 15, 1972, Lawrence Conklin was transferred from NHSP to Leavenworth, Kansas.

with rehabilitating its prisoners so that, among other reasons, its citizens are spared the costs of further crime from these individuals. Because of the detrimental effects transfer has on an inmate's rehabilitative program, the state has an interest in assuring that the decision to transfer is correct.

Having weighed the competing interests of the respective parties, I conclude that due process requires that the following procedures be met prior to transfer absent an emergency situation:

(1) Prior written notice of the charge or basis upon which recommendation to transfer is being made must be given to an inmate three or more days before the time set for hearing.

(2) The inmate must be allowed the assistance of a lay advocate of his choice in preparation for the hearing and at the time of the hearing. The inmate does not have an absolute right to counsel, and counsel need not be furnished for the hearing.

(3) A hearing must be held upon the transfer recommendation before an impartial tribunal consisting of three or more persons, at least one of whom is not a prison official. A prison official who has participated in the investigation of the charge or who has been involved in the decision to recommend transfer shall not be a member of the hearing tribunal.

(4) At the hearing the prisoner shall be afforded the right to present testimony and evidence on his own behalf and to cross-examine persons giving testimony in support of his transfer.

(5) A record of the hearing must be maintained. This does not mean a stenographic record. A tape recording is sufficient.

(6) The tribunal must make written findings of fact upon which its determination is based and must furnish a copy to the prisoner.

(7) The determination of the tribunal must be based on reliable and substantial evidence presented at the hearing.

(8) Administrative review, if the inmate requests it, of the decision must be available. The reviewing panel should consist of not less than three members, none of whom sat on the original hearing tribunal. It is my opinion that such review should be by the Board of Trustees of NHSP.

The aforementioned due process procedural safeguards must be afforded the prisoners *before* transfer except in those extraordinary situations where a valid governmental interest is at stake which justifies postponing the hearing until after the event. Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L. Ed.2d 113 (1970). Gomes v. Travisono, *supra*, 353 F.Supp. at 468–469. The only valid governmental interest which has been advanced as justification for postponing the hearing until after the transfer is the existence of an emergency situation at the prison.

In the case at bar, the Warden testified that the March 17 transfers were temporary in nature and were made to diffuse the tense situation which existed during the emergency lockup. He further stated that all of the transferees, in his opinion, posed a threat to the security of the prison during the emergency.

In an emergency situation, such as existed at NHSP,[17] all transferees must be brought back to New Hampshire immediately after the emergency has subsided and must be given a hearing in conformity with the due process guidelines outlined above if permanent transfer is contemplated. Gomes v. Travisono, *supra*, 353 F.Supp. at 469; Bowers v. Smith, *supra*, 353 F.Supp. at 1345.

The plaintiffs have all been permanently returned to NHSP, and the Warden testified that no future transfers, either of these plaintiffs or of other inmates of NHSP, are contemplated.

---

17. See Part I of this opinion relative to the general prison-wide lockup.

Accordingly, hearings need not now be held with regard to these plaintiffs concerning the reasons for their transfer to federal penal institutions during the emergency lockup. Given the emergency situation at NHSP on March 17, 1973, I rule that the transfers of these nine plaintiffs were not arbitrary and capricious.

 If, however, the fact that these plaintiffs were transferred will in any way have a detrimental effect on their chances of being released on parole or will result in any loss of statutory or meritorious "good time," hearings as to the reasons for the transfers shall be held forthwith. The transferred prisoners should now be treated as if the transfer had not occurred, and they are not to be penalized in any way whatsoever because they were transferred. Since I have found that the involuntary transfers had a punitive effect on the plaintiffs, I rule that they cannot now be subjected to disciplinary action on the basis of the disciplinary reports (Pl. Ex. 2) prepared during the lockup. When an inmate is transferred, disciplinary charges which formed part of the basis for his transfer must be dropped. Gomes v. Travisono, *supra,* 353 F.Supp. at 466. This ruling makes it unnecessary to decide the constitutional issues raised concerning subsequent punishment of the plaintiffs on the basis of the allegations contained in the disciplinary reports. The transmittal summaries which accompanied each of the transferred inmates shall be removed and expunged from the permanent record file of each of the plaintiffs.

 The evidence compels a finding that transfers have a detrimental effect on an inmate's opportunity to be released on parole and seriously interfere with an inmate's access to counsel and courts with regard to pending criminal cases in violation of the plaintiffs' First and Sixth Amendment rights to the United States Constitution. Accordingly, a transferred inmate shall henceforth be returned to NHSP for all parole hearings and for all legal proceedings and, where counsel attests to its necessity, for consultation with counsel a reasonable time before such proceedings.

In sum, I declare that, absent an emergency, involuntary transfer of an inmate to a penal institution in another state violates the First and Sixth Amendments and the Due Process Clause of the Fourteenth Amendment unless the aforementioned procedures are met.

This ruling is to be prospective only and will have no effect on any involuntary interstate transfers, other than those presently before me, which have been made prior to the date of this opinion.

## III. SEARCH AND SEIZURE

Plaintiffs allege in Part VI of the amended complaint that during the lock-up they were searched and their personal property was seized without a prior hearing, ex parte or otherwise, before an impartial party or tribunal and without a finding of probable cause for such search and seizure in violation of their rights under the Fourth Amendment of the Constitution of the United States. Plaintiffs further allege that they had no personal property in their cells endangering the security of NHSP or which endangered the lives, property, health, and general welfare of the defendants or their agents.

Plaintiffs' contention that the Fourth Amendment protection "against unreasonable searches and seizures" applies absolutely to prisoners in a penal institution during a declared state of emergency is simply incorrect. The United States Supreme Court in Lanza v. New York, 370 U.S. 139, 143, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), stated in dicta:

. . . to say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been

far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,' and so, of course, may an apartment. An automobile may not be unreasonably searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day.

The "requirements of security" were also cited as a limitation upon prisoners' rights under the Fourth Amendment in Palmigiano v. Travisono, 317 F.Supp. 776, 791 (D.R.I.1971), where Judge Pettine stated:

. . . the right to be free from unreasonable searches and seizures is one of the rights retained by prisoners subject, of course, to such curtailment as may be made necessary by the purposes of confinement and the requirements of security. At page 791.

I conclude as a matter of law that no constitutional question is raised by the searches and seizures effected during the lockup. The cell-block area is not a constitutionally protected area. Even if it were, the "requirements of prison security" during an emergency situation would provide sufficient justification for curtailment of plaintiffs' Fourth Amendment rights. In addition, NH RSA 622:7, subd. II specifically imposes upon the Warden of NHSP the duty: "To have the custody and superintendence of all persons confined in the prison, and of all property belonging thereto."

Accordingly, Part VI of the amended complaint is dismissed for failure to state a claim upon which relief can be granted. F.R.Civ.P. 12(b)(6).

## IV. ORDER

Defendants are permanently enjoined from involuntarily transferring inmates of the plaintiff class to a state or federal prison in another state without complying with the procedural requirements set forth in Part II of this opinion.

Plaintiffs shall not now be subject to any disciplinary action arising out of alleged infractions of prison rules and regulations during the lockup or because of the fact that they were transferred.

Compensatory damages are to be awarded the nine plaintiffs for the monetary benefits they would have earned while working at New Hampshire State Prison after the lockup was over, i.e., from May 8 to the return of each of the plaintiffs to NHSP. Damages are to be calculated at the rate of seventy-five cents per day.

Plaintiffs' claim for punitive damages is denied.

Costs and reasonable attorneys' fees to be awarded to the plaintiffs.

So ordered.