Louis BOWERS, Individually and on behalf of all other inmates of the Vermont State Prison at Windsor, Vermont

v.

Robert SMITH, Individually and as Warden of the Vermont State Prison, Windsor, Vermont, Kent Stoneman, Individually and as Commissioner of Corrections, State of Vermont, Montpelier, Vermont.

Civ. A. No. 6707.

United States District Court,
D. Vermont.

Oct. 18, 1972.

Paul Berch, So. Pomfret, Richard S. Kohn, St. Johnsbury, Vt., for plaintiff.

Charles Bristow, Asst. Atty. Gen. of State of Vermont, Montpelier, Vt., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS

HOLDEN, Chief Judge.

This complaint was filed by an inmate of the Vermont State Prison at Windsor, individually and on behalf of all other inmates of that penal institution. Jurisdiction is invoked under 28 U.S.C. § 1343, seeking temporary preliminary and permanent injunctive relief, as a civil rights action within the provisions of 42 U.S.C. § 1983.

A temporary restraining order was issued by the Honorable Sterry R. Waterman, United States Circuit Judge, sitting by designation in the District Court at St. Johnsbury, on September 2, 1972. On application of the defendant, Judge Waterman amended his original order on September 3, 1972. Temporary injunctive relief was continued until an evidentiary hearing scheduled before the Chief District Judge on September 7, 1972, at Windsor.

Judge Waterman's temporary order determined that the action should be maintained as a class action. And there is no cause to change the delineation of the class to which the modified temporary restraining order was made applicable. It is directed "—that class of prisoners who are confined in, or threatened with being confined in A Block following the escape by some prisoners on August 26, 1972, but does

not apply to prisoners returned to the prison *after having been apprehended subsequent to the August 26, 1972, escape."* It required that the plaintiff, and others similarly situated, be granted a fair and impartial hearing, with opportunity to cross-examine and a record be kept.

At the commencement of the hearing of the application for preliminary injunctive relief at Windsor, September 7, 1972, the court ordered the trial of the action on the merits advanced and consolidated with hearing on the application under Rule 65(a)(2), Fed.R.Civ.P. The evidence was concluded at a further hearing in Montpelier, Vermont, on September 13, 1972. Upon a finding of substantial compliance by the defendants with the temporary orders directed by Judge Waterman, the temporary orders were continued. Upon consideration of the evidence presented, representations of counsel and the full record presented, the Court finds these facts.

## FACTS

The Vermont State Correctional Facility, a maximum security institution at Windsor, has been the subject of continuing unrest over the past year. During this time two major disturbances have erupted. Three major incidents have occurred involving some nineteen escapes from within the prison during the preceding six months. Increasing security problems have developed involving violent assault, inmate possession of contraband, seizure of hostages and insubordination. On August 26, 1972, eight inmates escaped.

The immediate consequence of these escapes persuaded the defendant Kent Stoneman, as Commissioner of Corrections, that emergency conditions prevailed which jeopardized the public safety. The Commissioner issued a directive that all prison residents be locked in. All programs were halted. The prison farm was closed and its residents returned to the main prison building. An immediate and total review of all prison programming, classification of inmates, security procedures and personnel organization was instituted.

In this situation, a search of the prison area was undertaken. Farm inmates were returned and the remaining population assigned to Blocks B and C.

Up to this time Cell Block A had been maintained as an Honor Block. As such, it afforded the most desirable detention area in the prison. The prison administration determined that there was an immediate and pressing need to segregate known high security risks from the main prison population in the interest of the personal safety of the staff, other inmates and to reduce the risk of further escapes. Since A Block afforded the only available detention area to accomplish this separation, it was converted from an honor block facility to a detention area for inmates with a history of recent escapes and disruptive behavior. The Commissioner directed the Warden to undertake an immediate review of the case file of each inmate to determine the need for detention as a resident in A Block.

A special classification committee was set up to accomplish this purpose. Twenty-eight inmates were identified in this category and assigned to housing units in A Block.

Written notification of the classification and the reason for the action of the committee was given to each inmate so designated. Twenty-eight inmates were identified as high security risks and transferred to A Block without preliminary hearing.

The plaintiff Bowers received notice of his close custody classification on August 28 and was removed to A Block the same day. The notice, signed by the Warden, specified the reason for the action—"Security reasons, recent escape." The notice stated the program outlined for the plaintiff:

1. Individual counseling, evaluation and medication when prescribed.
2. Limited, in-cell Educational program offered.

3. Limited, in-cell Library services will be offered.

4. Scheduled, in-block exercise will be provided on a staggered basis.

5. Limited, in-cell canteen privileges.

6. Feed in until construction of physical control which will allow access to mess hall.

7. Religious counseling will be offered at reasonable times. Private religious worship services will be offered on an individual basis.

8. Visiting privileges will be scheduled on a staggered basis and limited frequency in an area segregated from general population.

9. Mail will be picked up and delivered daily.

10. Limited work assignment within cell block.

11. Any violation of institutional rule which would ordinarily result in disciplinary citation will still result in appearance before Disciplinary Committee.

The plaintiff was informed in writing that he would be housed in A Block, in safekeeping status, until reclassified. He would continue to earn statutory good time. He was advised that if he desired to be heard in the matter of this classification, he would be allowed to present his case.

Upon accomplishment of the A Block segregation, the main prison population returned to normal prison programs and routine.

Following the temporary restraining orders of September 2, as modified September 3, and in keeping with its provisions, classification hearings were conducted for all A Block inmates, exclusive of recent escapees, to determine in each instance the need for close custody and a determination of reasons why they should not resume their former status in the general prison population. The hearings were conducted in the presence of the inmate by a committee composed of correctional personnel. The residents of A Block were afforded an opportunity to present evidence through a limited number of two or three witnesses. They were afforded the opportunity of having the aid of their staff counsellor, if they so elected. The hearings were completed on September 5. The classifications made by the board are subject to appeal to the Commissioner of Corrections. No appeal had been taken up to September 13. The hearings resulted in the classification of nineteen inmates for detention in close custody. The A Block population was reduced to thirteen as of September 13.

The inmates detained in A Block on September 13 were afforded one-half hour of daily exercise outside their cells. Exercise time allowance is scheduled to be increased when construction of screened yard for this area is completed. Exercise includes walking, weight lifting, horseshoes, badminton and boxing. Showers are scheduled three times a week, with daily showers available at expense of exercise time. Change of clothing is made twice a week and change of bedding on a weekly basis. This is consistent with such provisions for the general population. In-cell feeding from hot food containers was scheduled for change to dining at tables on September 14, 1972.

Visitation privileges for A Block inmates were to be restored September 15. This will include visits by parents, wives, children and others approved by the chief supervising officer, to be allowed any morning, Monday through Saturday.

Magazine and paperback reading material are distributed and presently available to inmates in A Block. Additional specified library materials may be ordered and received on any work day.

Radio and television privileges are available to close security residents under the same procedures established by the entire institution.

Canteen supplies, including tobaccos and candy, may be ordered and received three times a week. Certain specified items, such as Coca Cola, are excluded.

Individual counselling service for specific problems is presently available upon request. Each inmate in A Block is scheduled for assignment to a specific counselling team, with the objective of reintegration into the general population.

Medical and dental services are available to A Block prisoners on the same basis which prevails for the general population.

*Bowers' Classification Hearing*

The plaintiff Bowers has escaped from Vermont correctional facilities four times since 1968; twice from the Rutland Correctional Facility and twice from the state prison complex at Windsor. His most recent escape was effected in April, 1972. His present confinement is for offenses of escape. His history of past escapes is the sole basis for classification and detention as a high security risk.

Bowers was afforded a hearing before the classification committee on September 5, which was composed of Richard Basso, Acting Director of Treatment, two custodial officers, Father Youngman, a prison chaplain, and Dr. Shaw, a prison psychiatrist. Legal counsel for the Department of Corrections was present as an advisor to the committee. Bowers informed the committee that he did not want his staff counsellor to represent him. The chairman, Basso, stated to the plaintiff that although he was the plaintiff's case counsellor, he could not represent him because of his chairmanship of the committee. The plaintiff requested representation by an attorney from Vermont Legal Aid, Inc. He was informed that the hearing was administrative and the request was denied.

A tape recording was made of the hearing. This recording was transcribed and introduced in evidence as Defendant's Exhibit D.

At the hearing Bowers was offered the opportunity to call two or three witnesses and to make an offer as to the relevance of the testimony of the ten or eleven other witnesses he requested to call. Bowers responded that if he was to be limited at all, he would decline to call any witnesses. He requested an opportunity to cross-examine the person who reported him to be a security risk. He was informed that his history of escapes was the basis for his reclassification.

However, the plaintiff read a statement into the record. He stated that he had been "programmed" 106 days, lost twenty days good time and had been sentenced to four years consecutive, for his last escape. He stated that he had an opportunity to escape August 26, but chose not to. He insisted that unless it could be established that he was implicated in the escape, the Board should "undo his classification."

Consideration of the plaintiff's Eighth and Fourteenth Amendment claims relate to two phases. The first is the emergency period from August 27 to September 6, 1972. The second phase concerns the establishment of a specific program for close security residents.[1]

Segregated confinement, of itself, is not violative of the Constitution. It may continue for reasonable periods of time to achieve valid and legitimate objectives. Sostre v. McGinnis, 442 F.2d 178, 192 (2nd Cir. 1971).

The initial confinement, which was ordered by the Commissioner of Corrections after the escape of August 26, 1972, was not punitive. It was a reasonable measure designed to secure a prison that had been beset with prior escapes and disciplinary disruptions. The administrative officials were called upon to meet and resolve the competing demands of maintaining the security of the institution and fairness to those inmates who did not participate in the escape and who, otherwise, were not given to disruptive behavior. See, Urbano v. McCorkle, 334 F.Supp. 161, 167 (D.N.J. 1971).

---

1. Photocopy of Defendant's Exhibit A.

The total confinement at the state prison following the escapes of August 26th was at first applied to the entire population. It was not limited to security risks, since all inmates were locked in their cells and substantially all privileges revoked. The early segregation of security risks and their transfer to A Block was undertaken. This procedure was essential to the return of the general prison population to normal routine.

### Eighth Amendment Claims

■ The close confinement, lack of yard exercise and reduced shower privileges, all contributed to distress and discomfort for A Block personnel. However, the restriction to that area on a temporary basis did not impose conditions which offend "evolving standards of decency" referred to in Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).

The record affords no implication of deprivation of food, clothing, sanitation and medical care. Efforts to provide a reasonable program for close security inmates were outlined in the notice of August 27, 1972, that immediate classification was underway.

■ In periods of emergency, prison officials may have to act quickly. Because of the demands of security, inadequate facilities and a lack of personnel, the defendants had justifiable cause to curtail privileges normally afforded prisoners and to proceed with segregation of security risks when the prison atmosphere is charged and tense. Burns v. Swenson, 430 F.2d 771, 779 (8th Cir. 1970), cert. den. 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972). Compare, Jackson v. Godwin, 400 F.2d 529, 532, 542 (5th Cir. 1968).

These conditions prevailed at Windsor on August 26. Every attempt was made to return the rest of the prison population to their regular routine and activities as soon as possible. The complete search of the prison and its grounds was considered a prerequisite to a return to normal routine. The reorganization of the staff and staff procedures was required. These efforts placed an understandable drain on prison resources. The temporary priority given by the prison to the needs of the majority of the prisoners, over those in Cell Block A, was a justified allocation of resources. To accomplish these objectives, the need for administrative segregation was imperative.

■ After the classification hearings ordered by Judge Waterman, the prison authorities implemented the initial program of regulated privileges for the prisoners on A Block, patterned after the plans for Administrative Segregation now used in other prisons. It involves a graduated extension in privileges based on the improvement of the individual prisoner's attitude and behavior. The benefits of such a program are not universally accepted. See, The Emerging Rights of the Confined, Correctional Development Foundation, Inc. (1972). Nonetheless, it is clear that such a plan does not offend the Eighth Amendment prohibition against cruel and unusual punishment.[2] Sostre v. McGinnis, supra, 442 F.2d at 193; U. S. ex rel. Walker v. Mancusi, 338 F. Supp. 311, 314 (W.D.N.Y.1971). See also, Wright v. McMann, 387 F.2d 519, 525 (2nd Cir. 1967).

■ However, the program does curtail substantial privileges typically afforded inmates of the general population. U. S. ex rel. Walker v. Mancusi, supra, 338 F.Supp. at 314. Although the evidence discloses no purpose to impose penal segregation on the inmates in A Block, confinement in that location is sufficiently severe to require minimal due process safeguards. Sostre v. McGinnis, supra, 442 F.2d at 196; U. S. ex rel. Walker v. Mancusi, supra, 338 F. Supp. at 314.

■ It is hardly open to question that prevention of escapes and internal disorders are legitimate objectives which must be secured. The needs of security

2. Idem.

justified the restrictive confinement imposed by way of administrative segregation in A Block. However, the classification to that status may not be achieved arbitrarily or without appropriate procedures. Sostre v. McGinnis, supra, 442 F.2d at 198.

### Due Process

Courts are reluctant to intervene until there is a clear showing that the administration of the state prison facility conflicts with federally protected rights. Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The hearing which was afforded the plaintiff must be measured in terms of due process as protected by the Fourteenth Amendment. Since the plaintiff was adversely affected by the classification procedure, he had the right to know why he was assigned to close security status. And the classification "should at least be premised on facts rationally determined." Sostre v. McGinnis, supra, 442 F.2d at 198.

Judge Waterman's order granted the plaintiff, and others similarly situated, a fair and impartial hearing upon notice of the charges asserted against them and in the adequate record to be kept. This included the right to cross-examine, to hear and refute the charges asserted against them.

> [D]ue process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account. Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed. 2d 1307 (1960).

This Court does not deem it to be its proper function to fashion and design administrative procedure which will meet the total demand of due process.

We must take this case as we find it. Sostre v. McGinnis, supra, 442 F.2d at 197; Wright v. McMann, 460 F.2d 126, 130 (2nd Cir. 1972).

Normally a prisoner should be afforded a hearing prior to his transfer to segregation. It is well recognized, however, that where an emergency situation exists, prisoners may be placed in segregation before they are given a hearing. Burns v. Swenson, supra, 430 F.2d at 779; Urbano v. McCorkle, supra, 334 F.Supp. at 167; U. S. ex rel. Miller v. Twomey, 333 F.Supp. 1352, 1353. (N.D.Ill.1971). The demands of reasonable action are met, provided a hearing is had soon after the transfer is completed.

The plaintiff Bowers received notice that the reason for his classification was his history of past escapes. No recent misbehavior was presented against him. There was no indication that he had been involved in the escape of August 26. For his previous escapes the plaintiff had been subjected to disciplinary segregation and sentenced to an additional term of confinement.

Having previously been isolated in "punitive" segregation for those escapes, he was again segregated administratively after the escapes of others on August 26. While this may have been justified by reason of the emergency conditions which prevailed, the inmate was certainly entitled to know why he was returned to close security. No reason was given except the prisoner's past history.

Bowers' staff advisor indicated his disqualification to be his counsellor, yet continued to be his judge. And another board member, Dr. Shaw, indicated an unchangeable predisposition concerning Bowers' classification; further that he considered him a psychopathic personality, unworthy of belief.

The plaintiff Bowers had access to legal counsel prior to his classification hearing. He so advised the Board. The failure of the Board to provide outside counsel did not violate the

demands of due process. See, Landman v. Royster, 333 F.Supp. 621, 654 (E.D. Va.1971).

■ Nor was he entitled to call the excessive number of witnesses he requested. To honor this demand would have unreasonably burdened the classification process.

■ The basic shortage in the record of Bowers' hearing lies in the fact that it fails to demonstrate any cause for his segregated status, other than his prior record of escapes. Although he apparently had been restored to the general population before August 26, the escape of others visited the ordeal of continuing segregation upon him once more. The contention advanced by Bowers that his classification as a risk on past escapes, was prejudicial and discriminatory, went unanswered. There was no reference to his intervening behavior nor to his capacity to return to B or C Blocks. The record of his hearing refutes the notion that his continuing classification as a security risk was premised on facts rationally determined. Such facts may be available but they are not demonstrated in the record presented to the Court.[3]

Upon these considerations the Court holds the classification hearing failed to meet the requirements of the Due Process Clause. The deficiencies trench upon accepted concepts of a fair hearing.[4]

Appropriate relief will be afforded to the plaintiff to allow further hearing on his classification as a security risk. Relief will be granted to the members of the class who are in the general prison population to provide for an administrative hearing prior to the classification to A Block. In order that extended punitive segregation may not be imposed under the guise of administrative segregation, it is necessary that there be period-

ic reviews of the case files of prisoners held in administrative segregation. The review shall include the opportunity of each inmate held in close custody detention to be informed and granted a hearing, upon request, concerning the cause for his continued segregation.

Provision will be made to assure the continuation of the Program For Close Security Residents, promulgated by the defendants on September 7, 1972, received in evidence as Defendant's Exhibit A, and the Program Aimed at Reintegrating Close Security Residents Into the General Population, dated September 8, 1972. Defendant's Exhibit C.

## ORDER

The following order is entered upon the findings of fact and conclusions of law filed October 11, 1972.

It is ordered:

1. The class represented by the plaintiff is defined to be

(a) Prisoners in Windsor State Prison classified as security risks who are presently confined in administrative segregation.

(b) Prisoners in the general population who are not presently classified as security risks, who are not in close detention, but who are, or will be subject to such classification and detention during the time that administrative segregation is maintained at the Vermont State Prison.

2. Those prisoners who are or may be subject to classification as security risks and transfer to administrative segregation shall be afforded a hearing. Their right to a hearing shall include notice of the charges against them, a fair and impartial determination, and the opportunity to call witnesses and cross-examine adverse witnesses. Each prisoner

---

3. Bowers Transcript, Defendant's Exhibit D.

4. The record of the classification hearing as to Carroll Perry was not presented to the court. He was classified to A Block for disruptive behavior. The evidence establishes that he threatened a guard on September 9, 1972. He was scheduled for hearing on September 13, 1972.

shall have the assistance of staff or lay counsel at the hearing and a record of the testimony should be kept.

3. Provided conditions within the prison permit, the hearing will be granted to the subject prior to his transfer to administrative segregation.

4. During the normal operation of the prison, the program for prisoners under close confinement in administrative segregation shall include at least the following elements:

   a. *Exercise.* Each inmate will receive the opportunity for exercise every day outside of his cell.

   b. *Showers.* Each inmate will receive the opportunity for a shower at least three times per week.

   c. *Clothing Change.* Each inmate will receive a complete change of clothing and linens at least twice a week, and the same type of bedding and blankets as is provided to the general population.

   d. *Food.* Regular hot meals will be provided in appropriate eating areas.

   e. *Religion.* Each inmate will be afforded the opportunity to attend a non-denominational service or he shall have access to visitation with clergy of record at least once a week.

   f. *Mail.* Each inmate shall have the same mailing privileges as the members of the general population.

   g. *Visitation.* Each inmate shall be allowed weekly visits from close members of his family and any other person approved by the Chief Supervising Officer.

   h. *Library and Radio-Television.* The availability of these services is within the discretion of the warden and commissioner of corrections. Such facilities may be provided for prisoners in administrative segregation under such uniform regulations as these officials may adopt.

   i. *Canteen Services.* Canteen services will be provided to close security inmates under reasonable regulations to be prescribed by the administration.

   j. *Medical Services.* Close security inmates will receive medical and dental services equivalent to those provided to the general population.

5. A program designed to accomplish the early reintegration of close security residents into the general population will be maintained as a continuing project.

6. A prisoner confined in administrative segregation for more than thirty days shall, upon request, be afforded an opportunity for a rehearing to review his classification as a security risk and a determination, by the classification committee, of the cause for his continued detention. Such hearings will not be required at intervals of less than thirty days.

7. Within ten days of this order, the plaintiff Louis Bowers, will be granted a rehearing in the matter of his classification and cause for his close custody. The hearing ordered shall be in conformity with the Court's opinion filed October 11, 1972, or the plaintiff Louis Bowers will be released from detention as a security risk and returned to the general prison population.