Donald E. AULT, Individually and on behalf of all others similarly situated, Plaintiff,

v.

Charles J. HOLMES et al., Defendants.

Civ. A. No. 2399.

United States District Court, W. D. Kentucky, Paducah Division.

Aug. 20, 1973.

Robert E. Delahanty, Louisville, Ky., Robert Plotkin, National, Legal Aid and Defender Ass'n, Washington, D. C., Elizabeth M. Freedman, Louisville, Ky., Allen M. Ressler, Ronald L. Roseman, Kansas City, Mo., for plaintiff.

Bruce K. Davis, Dept. óf Corrections, Frankfort, Ky., for defendants.

FINDINGS OF FACT, CONCLU-
SIONS OF LAW

OPINION AND ORDER

ALLEN, District Judge.

Plaintiff, Donald E. Ault, brought this action seeking injunctive relief for himself and fellow prisoners who have been transferred from the Kentucky State Penitentiary to penitentiaries outside the State of Kentucky, and also asks the Court to award him compensatory damages, punitive damages and attorneys' fees for alleged violations of his constitutional rights. The suit is brought pursuant to 28 U.S.C. § 1343(3) and (4); 42 U.S.C. § 1983; and 28 U. S.C. § 1331(a). Jurisdiction is conferred on the Court by these statutes and by the facts alleged in the complaint.

Donald Ault was an inmate of the Kentucky State Penitentiary at Eddyville, Kentucky, on August 15, 1972. Shortly before this date, defendant, Henry E. Cowan, had been appointed Warden of that penitentiary. When Cowan came to Eddyville, he found conditions to be bad there and that there was considerable unrest. He felt that it would be desirable for the discipline of the penitentiary to transfer some of the inmates whom he felt were agitators or troublemakers. Among those whom he thought to be in this category was Donald Ault.

Donald Ault was assigned to the Legal Assistance Office of the penitentiary and was known as a "writ writer". On August 15, 1972, he had written a letter to his parents complaining about the new regime instituted by Warden Cowan and stating, in part, that he believed the other inmates to be "jellyfish" because they would not stand up for their rights against the prison administrators. When this letter was received by the Mailing Department of the prison, its contents were disclosed to William Lasley, Assistant Superintendent of Treatment. Lasley then took Ault with him to the office of defendant Cowan, and

while Ault was in the office, prepared an Incident Report. The Incident Report stated that it had been observed for some time that the activities of Ault could possibly be stirring up trouble within the inmate population. The report further stated that this was pretty well verified in a letter he was sending out in which he criticized officials as well as inmates.

The report also stated that the letter contained much agitation and could possibly cause serious trouble if the inmates were knowledgeable of his comments. The report goes on to say that Ault was called to the Superintendent's office and that he displayed a very poor attitude and seemed very bitter. The report further stated that he admitted that what he had done could cause trouble, and he didn't want the other inmates to know about it. He related that he had been mistreated by the courts and it was his desire to get even.

The conference which took place between Ault, Cowan and Lasley on August 15th was then designated as an Adjustment Committee meeting and findings were made that Ault was guilty of agitating and using his influence to get other inmates involved. It was declared that he had placed himself in a position which was detrimental to his own welfare and to the security of the institution and that he admitted it but saw no wrong in it. He was then assigned to administrative segregation.

Ault remained in administrative segregation for some nine days. Administrative segregation resulted in Ault being denied the privilege of going to work in the Legal Assistance office, the privilege of associating with other inmates of the penitentiary and being denied the television and recreational privileges. There was no reduction in his food rations, nor was there any abusive treatment nor lack of any plumbing facilities, blankets nor the other necessities of life afforded to the other inmates.

On September 15, 1972, Ault and eight other inmates at Eddyville were brought to the office of the Warden and informed that they were being transferred to various other state penitentiaries outside the State of Kentucky. There was no hearing held, and a little more than one hour after the notification, Ault and the other eight men were placed in shackles and taken to the various other state penitentiaries to which they had been transferred.

Upon arriving at the Missouri State Penitentiary at Jefferson City, Missouri on the same day, Ault was placed in administrative segregation for five or six days before he was admitted to the general prison population. This is apparently standard procedure when new inmates are received at the Missouri State Penitentiary. No complaint was made by Ault as to the facilities at Jefferson City during his confinement to administrative segregation.

Ault does complain that there is no Legal Assistance office at Jefferson City and no law library, and that he has, therefore, suffered in his attempts to adequately prepare a case which he has pending in the Eastern District of Kentucky, and one that a fellow prisoner named Jenkins has pending in the Western District of Kentucky.

Ault's parents live in Utah, and his former wife has remarried and did not make any attempt to visit him while he was in Eddyville. He seems to be doing fairly well in the Missouri State Penitentiary, and in fact wrote the Warden a letter stating that things were "beautiful in Missouri". Other prisoners who were transferred were sent not only to Missouri but as far distant as Arizona, some 2,000 miles from Kentucky. In all cases, including Ault's, the written reason given for the transfers was stated as "interstate compact". This refers to the statutory provisions whereby Kentucky has agreed with other states such as Missouri and Arizona to the transfer between the states of prisoners, where it is found to be for the prisoner's rehabilitation, treatment and protection. See

K.R.S. 196.610, Article IV(a), which states as follows:

"Whenever the duly constituted authorities in a state party to this compact, and which has entered into a contract pursuant to Article III, shall decide that confinement in, or transfer of an inmate to, an institution within the territory of another party state is necessary or desirable in order to provide adequate quarters and care or an appropriate program of rehabilitation or treatment, said official may direct that the confinement be within an institution within the territory of said other party state, the receiving state to act in that regard solely as agent for the sending state."

With reference to the actual reasons for the transfer of Ault and the other prisoners, the Warden stated that primarily the transfers were to improve the discipline at Eddyville and for the protection of the inmates. In each case, rational reasons were given to this Court for their transfers, but no reasons were given to the inmates at the time of the transfers, nor were they allowed any opportunity to state why they should not be transferred.

The Court has previously held that, as to the claim for injunctive and declaratory relief filed by Ault as to the transfer, as citizens of Kentucky from Eddyville and LaGrange to out-of-state penitentiaries, the action should be considered as a class action. This is consistent with many decisions holding that, in actions involving the civil rights of inmates, class action determination should be made where those actions involve also procedures or practices of the prison administration that are challenged on constitutional bases. See Gomes v. Travisono, 353 F.Supp. 457 (D.C.R.I.1973); Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972); Anderson v. Nosser, 438 F.2d 183 (5th Cir. 1971); Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968).

The Court is of the opinion that while Ault and his fellow transferees had caused difficulties to the prison authorities in Kentucky on some occasions prior to their mass transfer, that there was no compelling reason for the transfer on September 15, 1972. The Court does not believe that the defendants presented persuasive evidence that violence had been indulged in by these transferees during the period immediately predating their transfer, or that they had planned a mass escape from the institution, or the taking of hostages, or that they had planned a riot or other similar disturbances.

In light of this finding and the rapidly evolving constitutional doctrines set out in Gomes v. Travisono, supra; Capitan v. Cupp, 356 F.Supp. 302 (D.C.Ore. 1972); Clutchette v. Procunier, 328 F. Supp. 767 (D.C.Cal.1971); and Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), the Court concludes that transfer procedures such as took place with regards to Ault and his fellow transferees must comport with at least the most basic elements of procedural due process. The rationale of these cases is to the effect that where there is a serious change in a prisoner's confinement, procedures relating thereto must comport with basic due process. In both *Gomes* and *Capitan* it was held that the transfer of prisoners to a penitentiary removed from their native state is a serious change in confinement status.

The various cases which have affirmed this principle are at some variance as to what are the basic minimal elements of procedural due process. For example, in Sostre v. McGinnis, supra, the Second Circuit refused to follow the district judge's holding setting out specifically procedural due process in prison proceedings, particularly those requiring confrontation and cross-examination, calling of witnesses by the prison counsel or counsel substitute, or a written statement of evidence and rationale. The court did say, however, that if substantial deprivations are to be visited upon a prisoner, that he should be, in most cases, confronted with the accusa-

tion, informed of the evidence against him and afforded an opportunity to explain his actions.

In Gomes v. Travisono, supra, the court held that prior to transfer, absent an emergency situation or a compelling state interest, the inmate must be given written notice of the reasons for transfer; that the charge must be investigated and reviewed by a superior officer; that a hearing be held before an impartial board; and that administrative review be available and a record kept. That case also held that the inmate must be read the charge, given the opportunity to respond, the right to call and examine witnesses, and for the assistance of a lay advocate. It was further held that the decision to transfer must be based on substantial evidence.

In Clutchette v. Procunier, supra, the court held that any serious charge against a prison inmate should require at least seven days notice; the right to call witnesses and to cross-examine witnesses; the right to counsel or substitute counsel; reasons for the decision given, based on the evidence; a decision by an unbiased fact-finder; and the right to appeal.

The above decisions setting out the courts' notions of what constitutes rudimentary due process are based primarily on the holdings in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287; and Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718. It should be noted, also, that no circuit court has yet attempted to delineate the specific due process procedures required in the case of out-of-state transfers nor has the Supreme Court. In fact, as yet, neither the appellate courts nor the Supreme Court have ruled upon the constitutionality of a transfer of a prisoner to an out-of-state institution with respect to the Fourteenth Amendment. However, in Hillen v. Director of Department of Social Service and Housing, 455 F.2d 510 (9th Cir. 1972), cert. denied, 409 U.S. 989, 93 S.Ct. 331, 34 L.Ed.2d 256, it was held that no constitutional claim was raised by the transfer of an inmate

from Hawaii to a federal penitentiary in California. However, this was a pro se action and no evidentiary hearing was ever held, nor were there constitutional issues adequately presented nor briefed.

Likewise, Duncan v. Madigan, 278 F. 2d 695 (9th Cir. 1960), cert. denied, 366 U.S. 919, 81 S.Ct. 1096, 6 L.Ed.2d 242, held that an inmate had no right to be heard with respect to his place of custody, and that the transfer did not deny him equal protection. That case did not reach the Fourteenth Amendment claims as to lack of due process as in this action.

With all due deference to the problems of the defendants, which are manyfold and serious, it would seem that the absence of an emergency, such as a riot, taking of hostages by inmates, flood, or other extraordinary situations, inmates held in the State Penitentiary in Kentucky, who are residents of Kentucky, should be afforded rudimentary due process rights before being transferred to a penitentiary outside the state. The reasons for this holding are set out at some length in Gomes v. Travisono, supra, and also in the very objective and intelligent testimony afforded to the Court by Mr. Keve, a distinguished criminologist. The primary rationale for the decision that a transfer constitutes a serious change in a prisoner's status lies in the fact that he is cut off from the proximity of family and friends located in the state of domicile. Secondly, the inmates who are transferred are required to make new adjustments to new environments. Thirdly, the inmate may have difficulty in preparing his home and job plans. Fourthly, the chances of parole may be reduced somewhat, although there is no conclusive way of determining this to be a fact.

In a 1916 case, Keliher v. Mitchell, 250 F. 904 (D.C.Mass.), the district judge condemned the practice of transferring prisoners some 1,500 miles from the state of original confinement. The reasons set out in his opinion have not diminished over the course of the years and, therefore, we must conclude that such transfers, while not prohibited by

the Eighth Amendment, must at least be validated by due process.

More specifically, the Court holds that in each case where a prisoner is to be transferred out-of-state and the transfer is not in accordance with his wishes, and there is no emergency situation, the prisoner must be afforded the following safeguards:

1. A brief statement of the reasons for his proposed transfer;
2. Adequate notice of the date set for the transfer hearing, such notice to be given at least seven days prior to the hearing;
3. The right to call witnesses, cross-examine witnesses, and the right to counsel substitute, but not to a licensed attorney;
4. The decision of the committee should be stated in writing and should be made by an unbiased fact-finder, not involved in any particular incident which constitutes the basis for transfer.

With reference to Ault's claims for damages and counsel fees, the Court is convinced that no compensatory or punitive damages or attorneys' fees should be awarded. At the time the defendants transferred the plaintiff and members of his class to the out-of-state institutions, the question of the unconstitutionality of such transfers was very much in doubt, as is evidenced by Judge Pettine's reference in Gomes v. Travisono, supra, to the decisions of the Ninth Circuit, which had previously held that such transfers within the federal system were not unconstitutional. It is only very recently that *Gomes* and Capitan v. Cupp, supra, have been decided and, in fact, *Gomes* and *Capitan* were reported after the decision to transfer the inmates.

In Jones v. Rundle, 358 F.Supp. 939, 1973 (D.C.E.D.Pa.), Judge Body held that in a civil rights action brought by prisoners, no damages should be awarded, even though a breach of constitutional rights was shown, inasmuch as the law was very unsettled in that field at the time of the constitutional violations. As the District Judge pointed out in that case, to impose liability for damages upon state wardens and other state correctional authorities in prisoner civil rights cases, where the law has not been finally settled by an authoritative Supreme Court or Circuit Court decision, would discourage qualified persons from accepting such positions.

It should be noted that the cases upon which plaintiff relies for an award of damages are those involving either a default judgment, such as United States ex rel. Neal v. Wolfe, 346 F.Supp. 569 (D.C.E.D.Pa.1972), or involving the confinement of a plaintiff to punitive segregation without a rational basis therefor, Wright v. McMann, 460 F.2d 126 (2nd Cir. 1972). Of course, since the Court has reached the conclusion that no compensatory damages should be awarded to plaintiff, it follows that no punitive damages could be awarded to him. Even in cases where default judgments have been rendered against prison authorities and compensatory damages awarded, no punitive damages have been allowed, in the absence of showing malicious actions in gross disregard of plaintiff's rights. United States ex rel. Motley v. Rundle, 340 F.Supp. 807 (D.C.E. D.Pa.1972), and cases cited therein.

No authority is cited by plaintiff in support of his contention that he is entitled to an award of counsel fees or to punitive damages, and, in fact, several of the cases cited by plaintiff as authority for the awarding of compensatory damages deny the award of punitive damages; see, for example, United States ex rel. Neal v. Wolfe, supra.

The Court has not overlooked Ault's contention that he should be entitled to damages for the period when he was in administrative segregation in Eddyville. Ault did not make such a contention in the pleadings filed by his counsel; however, at the trial, extensive proof was taken bearing on this issue, and no objection was taken to the intro-

duction of such proof. Rule 15(b), Federal Rules of Civil Procedure, and the cases interpreting it are authority for the ruling that where issues are not raised by the pleadings but are tried by express or implied consent, they shall be treated as having been properly raised. See Century "21" Shows v. Owens, 400 F.2d 603 (8th Cir. 1968); and Continental Illinois National Bank and Trust Company of Chicago v. Ehrhart, 127 F. 2d 341 (6th Cir. 1942).

■ Addressing Ault's claim for damages, in this connection, it should be observed that the procedures carried out by defendants Cowan and Lasley, and their findings, did not measure up to the requirements of administrative due process already specified by the prison itself. First, only two of the three members required to be on the Adjustment Committee were there, and secondly, Ault does not seem to have been given any advance notice of the meeting of the Adjustment Committee. However, following the decision in Clutchette v. Procunier, supra, the Court holds that isolation for a period less than ten days is not such a grievous loss to the prisoner as to constitute a serious change in the conditions of his confinement, and to rise to the dignity of an infraction of a constitutional right.

■ Ault has also raised the claim for damages based on alleged loss of personal property caused by the transfer. It appears from the evidence that, because of the speedy nature of the transfer, certain papers belonging to Ault and a few other personal items were left behind at the penitentiary in Eddyville. Upon his written request to the Eddyville authorities to return these items, most if not all of them were returned. Ault did not introduce any evidence as to the value of any of the items which he claims were lost, which consisted, according to him, of notebooks with legal citations, family photographs, and a transcript of his original conviction. Defendant Cowan testified that the personal property of Ault and the other transferees was sent to them after their transfer, and that he received no inquiries from Missouri as to the personal property. He also stated that the personal property in question was sent by Railway Express.

In the absence of positive evidence that the plaintiff was, in fact, deprived of some of his personal property by the actions of the defendants, the Court concludes that plaintiff is not entitled to damages on this ground. Even if he were so entitled to damages, the award would have to be only nominal, since no value was placed on any of the specific items in contention.

Finally, in accordance with the findings of fact and conclusions of law set forth above, the Court has this day entered a separate judgment.

## JUDGMENT

The Court having entered its findings of fact and conclusions of law, and being fully advised in the premises,

It is hereby ordered and adjudged as follows:

1. Plaintiffs have properly brought this action on their own behalf, and pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all adult male persons presently incarcerated, pursuant to criminal conviction by Kentucky courts, who were, prior to their conviction, residents of the State of Kentucky in that plaintiffs' class is so numerous as to make joinder of all members impracticable; the policies and procedures challenged by the named plaintiffs have been applied to numerous members of plaintiffs' class, and are applicable to all members of plaintiffs' class; and the claims of the named plaintiffs are typical of and common to all members of the class.

2. Defendants are enjoined from the involuntary transfer of any Kentucky male prisoner, incarcerated pursuant to a judgment of conviction by Kentucky courts, who was a resident of Kentucky and domiciled therein prior to convic-

tion, to a state or federal prison in another state, unless:

A. Prior to transfer (absent an emergency situation or compelling state interest), the inmate is given written notice of the charge or reasons for transfer; this charge or reason is investigated and reviewed by a superior officer; a hearing on the question of transfer is held before an impartial board; administrative review of the charge is available; and a record of the proceeding is kept. At the hearing the inmate must be read the charge and given the opportunity to respond, which opportunity shall include the right to call and examine witnesses and to have the assistance of a lay advocate. The decision to transfer must be based on substantial evidence.

In the event of an emergency situation resulting in transfer, the inmate must be returned to Kentucky for the hearing and procedures outlined above soon after the emergency has subsided; and

B. Periodic review is made of the status of the transferred inmate, and whether he should be returned to Kentucky. The Court suggests review every six (6) months; and

C. Written regulations are promulgated which guarantee:

(a) the return of a transferred inmate to Kentucky for all hearings before the parole board which will consider the subject of his parole;

(b) the return of a transferred inmate to Kentucky for appearance in all court proceedings in Kentucky in which he is involved; and

(c) the return of a transferred inmate to Kentucky to confer with counsel in preparation for Kentucky legal proceedings on affidavit of counsel that the presence of the inmate is necessary.

3. Defendants shall return to custody in Kentucky, within a reasonable period of time, the inmates transferred on September 15, 1972, and shall return to Kentucky all inmates who have been transferred at other times for hearings on whether these inmates should be returned to custody in Kentucky.

4. Plaintiff Donald E. Ault's claim for damages is hereby denied, as is his claim for attorneys' fees.

5. It is hereby determined that this is a final and appealable judgment and that there is no just cause for delay in its entry.