Douglas **GOMES** et al.,
Plaintiffs,

v.

Anthony P. **TRAVISONO** et al.,
Defendants.

Nos. 73–1065, 73–1066.

United States Court of Appeals,
First Circuit.

Argued Sept. 7, 1973.

Decided Dec. 28, 1973.

As Amended Jan. 7, 1974.

Richard J. Israel, Atty. Gen., with whom W. Slater Allen, Jr., Asst. Atty. Gen., was on brief, for Anthony P. Travisono, and others.

Max D. Stern, Boston, Mass., with whom Stern & Shapiro, Boston, Mass., Cary J. Coen, Providence, R. I., Jack Greenberg, New York City, and Stanley A. Bass, Chicago, Ill., were on brief, for Douglas Gomes, and others.

Before COFFIN, Chief Judge, KILKENNY * and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

These appeals raise the general question: to what extent, if at all, does the Constitution require that procedural rights be extended to prisoners prior to their transfer from a prison in one state to that in another state? The district court, in a lengthy and thoughtful opinion, 353 F.Supp. 457 (D.R.I.1973), granted broad injunctive and declaratory relief. We affirm in part and reverse in part.

This action, brought on behalf of all male Rhode Island inmates under 42 U. S.C. § 1983 and 28 U.S.C. § 1343, challenges the constitutionality of transfers from Rhode Island's Adult Correctional Institution (A.C.I.) to various out of state and federal prisons [1] without prior notice, statement of reason, or hearing. The named plaintiffs were among eleven inmates of A.C.I. who were transferred to prisons throughout the country in the fall of 1971. Tensions at the correctional institution following the September prison uprising at Attica had been compounded by a work strike of correctional

---

* Of the Ninth Circuit, sitting by designation.

1. The transfers to both state and federal prisons were authorized under R.I.G.L. § 13–11–1 et seq.; R.I.G.L. § 13–12–1 (1956, 1969 Reenactment) and 18 U.S.C. § 5003.

officers, a predominance of unseasoned employees, discovery of bomb blueprints and racial animosities. An Afro-American Society had become active and had put forward a list of grievances which were being discussed. Rumor spread that serious disruption was contemplated and planned by the Society.

As a result of these circumstances, which created anxiety among the personnel, several of the Society's most prominent members along with four white prisoners, suspected of planning to take advantage of any distraction to attempt an escape, were summarily taken out of the prison population and transferred. No charges or statement of reasons were presented to the prisoners. Neither the prisoners' attorneys nor the prisoners themselves were given notice of transfer or afforded an opportunity to be heard. They were transferred to prisons in several states, including Georgia, Kansas and Illinois. All of those removed were segregated in the receiving prisons for a period of from two to six weeks.

We note at the outset that what is not at issue in this case is the power to transfer prisoners.[2] Nor does the resolution of this case depend on any "right" to remain in a particular prison.[3] What is at issue is whether and to what extent procedural rights exist when a prisoner's transfer out of state is contemplated. Analysis of the right to procedural due process begins with an assessment of the prisoner's deprivation on transfer. Invocation of any rights depends upon whether treatment inherent in the transfer process constitutes "grievous loss". Morrissey v. Brewer, 408 U.S. 471, 483, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L. Ed.2d 556 (1972); Board of Regents v. Roth, 408 U.S. 564, 570–571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

2. Much of the precedent cited to us is directed to the transfer power issue. See, e. g., Hillen v. Director of Social Service and Housing, 455 F.2d 510 (9th Cir. 1972), (no challenge to procedures under which the prisoner was transferred); Hanvey v. Pinto, 441 F.2d 1154 (3d Cir. 1971); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969) (held that the Attorney General had right to determine the federal prison in which to *initially* place the prisoner); Lawrence v. Willingham, 373 F.2d 731 (10th Cir. 1967) (reached only the issue of the Attorney General's power to designate the place of confinement for a prisoner under 18 U.S. C. § 4082(a) contrary to the sentencing court's recommendation; no procedural due process challenge was raised); Duncan v. Madigan, 278 F.2d 695 (9th Cir.), cert. denied, 366 U.S. 919, 81 S.Ct. 1096, 6 L.Ed.2d 242 (1960) (upheld the constitutionality of 18 U.S.C. § 5003 permitting transfers to federal prisons). United States ex rel. Stuart v. Yeager, D.C., 293 F.Supp. 1079, aff'd, 419 F.2d 126 (3d Cir.), cert. denied, 397 U.S. 1055, 90 S.Ct. 1400, 25 L.Ed.2d 673 (1969) (no procedural due process challenge).

3. Some cases have disposed of challenges to transfers on the simplistic ground that a prisoner has no vested or constitutional right to remain in a particular prison. See, e. g., Gray v. Creamer, 465 F.2d 179 (3d Cir. 1972) ("a state prisoner has no constitutional right to remain in any particular prison."); United States ex rel. Thomas v. Bookbinder, 330 F.Supp. 1125 (E.D.Pa. 1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971) ("a prisoner has no vested right to be assigned or to remain in a medium security prison", but where prisoners are segregated in the receiving prison they must be afforded procedural safeguards); Verde v. Case, 326 F.Supp. 701 (D.C.Pa.1971) (due process challenge to transfer failed to state a claim); Duncan v. Ulmer, 159 Me. 266, 191 A.2d 617 (1963) ("it must be pointed out that the prisoner is speaking of a privilege not a right"). The force of the inference drawn from the premise of these cases is substantially eroded by the Supreme Court's rejection of "the concept that constitutional rights turn upon whether a government benefit is characterized as a 'right' or as a 'privilege'." Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534 (1971). We therefore reject the basis for these decisions on the authority of *Graham, supra,* and for reasons discussed in the text, we reject their conclusion as well.

In this case assessments of deprivation of the particular prisoners transferred are a predicate to any judgment giving them relief. And, since broad declaratory and injunctive relief was sought and granted, it is relevant to inquire whether, apart from the unique facts relating to these plaintiffs, transfer in general is attended by sufficient deprivation to warrant procedural safeguards.

The district court examined the short and long range consequences to the individuals transferred by A.C.I. to discover whether those transfers resulted in grievous loss. The court made findings, supported by the evidence, that: (1) transferred inmates were placed in "administrative" segregation in the receiving institution for a period of two to six weeks, often in cells used for discipline; (2) the records of the transferred inmates rarely accompanied them, nor was the reason for transfer made clear to receiving institutions; (3) as a result, the classification board of the receiving prison placed the inmates in work assignments and other programs not consistent with prior treatment; (4) generally, because they were transferees, they were precluded from rehabilitative programs, psychological therapy sessions, and educational programs; (5) they received less or no pay for their work; (6) all transferred prisoners had fewer visits from family and friends; (7) none saw an attorney during the period of transfer; (8) transfer affected parole chances because it denoted troublemaker status on the record and because the transferred inmate may not be present at parole board hearings while resident inmates usually are present;

and (9) there were serious problems of orientation to a new environment.

Wholly apart from the specifics of this case, we think it well recognized that transfer characteristically entails inconveniences and privations. Some arise by the distance factor alone, increasing the difficulty of communication and visitation. *See* Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972). Other disadvantages stem from the breaking off of established programs, both educational and rehabilitative, and orientation to a new setting, programs, rules and companions.[4] Still other privations exist by reason of the administrative requirements of the receiving prison. New inmates must often be subject to "administrative" isolation pending examination, classification, and integration into a new prison community.[5] Although the reason for this segregation may be distinguished from the reason for punitive segregation, the impact upon the inmate is no less. Finally, if the fact of transfer noted on an inmate's record without further explanation connotes "troublemaker", the inmate may be faced with recurrent unfavorable dispositions as to his status within the prison and might eventually suffer an unfavorable parole decision,[6] resulting in a longer term adverse alteration of the inmate's living conditions.

■ Whatever may be the purpose of transfers or the inevitability of some of their consequences, we necessarily look to their effect on the inmate. Having examined both the initial or short term consequences to the transferred prisoner and the potential for continuing impact

---

4. Hoitt v. Vitek, 361 F.Supp. 1238 (D.N.H. 1973); *cf.* Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark.1970); *see generally* Turner, Establishing the Rule of Law in Prisons, 23 Stan.L.Rev. 473, 501–503 (1971).

5. *See* Ault v. Holmes, 369 F.Supp. 288 (W.D. Ky. Aug. 23, 1973) (prisoners in receiving prisons segregated for five or six days); Hoitt v. Vitek, 361 F.Supp. 1238 (D.N.H. 1973) (transferees routinely placed in quarantined segregation); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971) (55 transferred

prisoners were kept segregated for 30 days in receiving prison).

6. A prisoner's "disciplinary record may follow him throughout the prison system; if his punishment was without cause, he is punished anew each time his record is used against him. Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 . . . (1967). Similarly, his disciplinary record may affect his eligibility for parole . . . . ." Hudson v. Hardy, 137 U.S.App. D.C. 366, 424 F.2d 854, 856 (1970).

upon his liberty, we conclude that *some* due process is mandated in all transfer cases.[7] Here, as in Palmigiano v. Baxter, (1st Cir.1973), 487 F.2d 1280 the *extent* of the process due requires more delicate examination, and a balancing of the state's interests against those of the prisoner.

The balancing of interests is more complex in these transfer cases than it is where discipline for a specific act is contemplated. Discipline, or punishment, while ranging in degrees of severity, is generically all of a piece. Transfer of a prisoner from one state to another[8] may be made for any of a number of reasons. It may be "punitive", in the sense that the prison administration is simply attempting to punish a misdeed. It may be for "security" if, as here, it is predicated on the apprehension of general and uncontrollable disturbance or on predictions of future misconduct by an inmate. It may be made for the best interests of other inmates if the prisoner is disruptive, a threat to others, or otherwise a bad influence as would be the case of a professional with continuing outside criminal contacts. A transfer may be for the best interests of the prisoner himself, for his safety or for his rehabilitation if it is believed that he will be better off elsewhere. And a transfer may be dictated by the needs or shortcomings of the institution, e. g., to alleviate overcrowding. The variety in kinds of transfer decisions and the need for latitude in administrative discretion dis-

suade us from attempting to impose any extensive blanket of due process procedures to cover all transfers.

This, however, was what the district court did. It prescribed as a predicate for any transfer, except an emergency situation, notice of reasons for transfer, a review of the basis for transfer by an investigative officer, a hearing before an impartial board at which the inmate would have the right to call and examine witnesses with the help of a lay advocate, the decision to transfer to be based on substantial evidence, with a record to be kept and administrative review of the decision to be available. In addition to these hearing-related procedures, an investigation was mandated, prior to transfer, of the rehabilitative programs of the receiving institution and a statement given the receiving institution identifying in what respect Rhode Island's facilities were inadequate for the particular needs of the putative transferee. After transfer, the court required periodic review of the transferee's status and the adoption of regulations ensuring the return of transferees for parole board hearings, for conferences with counsel in preparation for legal proceedings, and for appearance in court proceedings. Finally the court ordered that the eleven inmates transferred on November 18, 1971 be returned to custody and that inmates transferred at other times be returned for hearings on the issue of the propriety of their transfer.

7. Ault v. Holme, 369 F.Supp. 288 (W.D.Ky. Aug. 23, 1973); Hoitt v. Vitek, 361 F.Supp. 1238 (D.N.H.1973); White v. Gillman, 360 F.Supp. 64 (S.D.Iowa 1973); Capitan v. Cupp, 356 F.Supp. 302 (D.Or.1972); *see* Bundy v. Cannon, 328 F.Supp. 165 (D.Md. 1971) (court ruled that procedural due process must be afforded when transfer was to segregated·confinement in receiving prison); *cf.* Biagrelli v. Siegliff, 483 F.2d 508 (July 7, 1973) (a prisoner put into administrative segregation is entitled to written notice of the basis of his removal and opportunity to rebut the charges in a hearing); Bowers v. Smith, 353 F.Supp. 1339 (D.Vt.1972) (inprison transfer to segregated area for non-

punitive reason required due process safeguards); Urbano v. McCorkle, 334 F.Supp. 161 (D.N.J.1971) (prisoners confined to administrative segregation entitled to same minimal due process as prisoners confined to segregation for disciplinary infractions). *See also* citations in Kranz, The Law of Corrections and Prisoners' Rights 677 n. 2 (1973).

8. We confine ourselves here to interstate transfers, partly because this appeal concerns only such transfers and partly because the disadvantageous impact of transfer to different state correctional systems is more likely to be greater in significant respects than transfers within a state.

■ We feel constrained to paint with a smaller brush. While much of what the court required is appropriate for some transfer situations and some of it appropriate for all, our approach requires us to be rather stringently selective. We observe at the outset that we endorse the exception for emergencies, provided for by the district court. We recognize that present or impending disturbances which might overtax the control capacity of a prison creates a dominant interest in prison authorities being able to act without delay if they feel that delay would endanger the inmate, others, or the prison community. Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1970). This is so even though the assessment of difficulties may subsequently prove to be unfounded and the transfers unjustified. Due process requires, however, that once the transfer takes place, the inmate be granted at the earliest opportunity the minimal procedures which we identify *infra* as due.

■ At the other end of the spectrum from the emergency situation, where the authorities may act without present hindrance, is the transfer which is made to punish a prisoner for his past conduct.[9] In such a situation, where, but for transfer, the loss of classification and privileges would be imposed within the prison, we think that the balance has already been struck by the A.C.I. rules set forth in Morris v. Travisono, 310 F. Supp. 857, 871–874 (D.R.I.1970), and adopted as law by Rhode Island. While "transfer" itself is not contemplated by those rules, we would think it anomalous, both from a due process and an equal protection point of view, if the prison authorities could accomplish by transfer a procedure-free punishment which they could not accomplish within their own walls. We therefore affirm the district court insofar as its order imported the *Morris* rules, but only as to transfers which are based on prisoners' past misconduct within the prison.[10]

■ As for the variety of other transfers, we work from the premise that once the application of due process requirements is justified by the loss or disadvantage stemming from the institution's action, the state must afford minimally those processes which are of little or no burden. *Palmigiano, supra,* text at notes 19–20. These procedures must be supplemented with the opportunity to correct errors of fact on which administrative decisions are based and to assure that grievous loss will not be imposed without careful examination to determine that grounds for such an imposition exist.[11] We consider due process in the present circumstances to include: (1) notice that a transfer is contemplated; (2) notice of the reasons for the proposed transfer; (3) a personal hearing before a decisionmaker; and (4) a reasonable opportunity, at the hearing, to controvert factual assertions concerning the inmate that have been advanced in support of the decision to transfer. The function of the hearing would not be to force the warden to justify his de-

---

9. For example, where the prison, lacking sufficient maximum security facilities, seeks to transfer an inmate, presently a member of the general prison population with normal privileges, to another institution's maximum security unit.

10. We recognize the possibility that a prisoner who has recently engaged in misconduct may be sought to be transferred because of the authorities' apprehension that the conduct may be repeated, endangering the security of the prison. In the absence of other basis, we think that the *Morris* rules and their intent would preclude the boot-strapping result which would occur were past misconduct to provide a sufficient basis for apprehension of future misconduct. We necessarily rely on the good faith of the authorities.

11. The effort to premise action imposing substantial losses on accurate factual determinations is a central theme in procedural due process cases. *See,* e. g., Gagnon v. Scarpelli, 411 U.S. 778, 785, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); Morrissey v. Brewer, 408 U.S. 471, 479–480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969).

cision by any quantum of evidence, or to provide the basis for review by a remote independent official, board, or court. But it would serve the prisoner's interest in not being subjected, without an opportunity to present his views and factual corrections, to an arbitrary decision stemming from the malice of a guard or other prisoner, or an untrue rumor.

We are clear that these four requirements are the least that due process requires. We are also presently of the view that, in the kinds of transfers we are addressing, we cannot impose on the prison authorities the requirements of a pre-hearing investigation, the right of the inmate to the help of a lay advocate, decisions based on substantial evidence, or administrative review.

We are not so clear about two other matters. The first is the degree of impartiality of the decisionmaker. While absolute impartiality is the ideal, we see difficulty in requiring this in the type of transfer case we are dealing with. For, having separated out the kind of case where charges of misconduct are being pressed against the inmate, and where it is most inappropriate that the prosecutor and decider be the same person, we are left with matters where the superintendent or warden is necessarily vested with wide discretion. Moreover, it may well be important for the inmate to be able to address directly the warden or his designate. With these admittedly limiting strictures, we leave to the district court the fashioning of a transfer hearing tribunal which can aspire to reasonable objectivity while recognizing the responsibility and wide discretion of the warden or superintendent. In like manner we leave to the court to work out an informal record-keeping require-

ment, short of a verbatim transcript, that will preserve the points and contentions made.

▬▬▬ As to those parts of the court's order going beyond the notice and hearing procedure itself, we again must be selective. Because noting the reason for transfer on the papers forwarded with the transferred inmate is so little to require and may substantially avoid unnecessary restrictions in the transferee institution, we do not disturb that requirement. We also believe that the reason for the transfer must be noted in the inmate's records in Rhode Island, so that unwarranted inferences will not unfairly diminish opportunities for parole. Nor do we take issue with the requirements of periodic review of the status of transferred inmates on terms which the court may deem feasible from the standpoint of A.C.I. or of regulations governing the return of transferred inmates to Rhode Island for parole board hearings, reasonable consultation with counsel, and appearance in court proceedings.[12] We do not, however, affirm the requirement that prior to transfer prison authorities investigate rehabilitative and treatment programs in receiving institutions or submit a statement to receiving institutions of A.C.I.'s inadequacies and recommendations relating to the particular transferee.[13] As is true of much of the court's order, this may well be desirable; we cannot say that it is compelled.

Finally, we affirm the court's order returning to Rhode Island the eleven inmates transferred on November 18, 1971 for the kind of hearing we have described. As to other inmates who have been transferred, while they have a right to hearing, they should be advised of their right and those wishing to avail

12. Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); Klopfer v. North Carolina, 386 U.S. 213 at 219, 87 S. Ct. 988, 18 L.Ed.2d 1 (1966).

13. The court below based a requirement of evaluation of receiving prison facilities on due process. As we have indicated we do not think that due process extends this far.

See Sostre v. McGinnis, 442 F.2d 178 (2d Cir. en banc 1971). Nor do we feel such investigation of receiving prisons is required by the New England Corrections Compact or 18 U.S.C. § 5003. In addition, we agree with the court that neither the Compact nor federal law preclude transfers for nonrehabilitative purposes.

themselves of it should be given the opportunity.

Time and experience may indicate that the procedures we have identified as minimally necessary will prove to be illusory or inadequate. We prefer, however, to move gingerly in this uncharted area.

The judgment is affirmed in part and reversed in part. The case is remanded for further proceedings consistent with this opinion.

LEVIN H. CAMPBELL, Circuit Judge (concurring).

At the risk of repeating what is clear, it is my understanding that the opinion is limited to the situation before us, namely transfers to out-of-state prisons. I do not believe that a transfer from one to another institution within the jurisdiction of commitment would carry with it any of the rights described in the court's opinion. Transfer to a foreign jurisdiction has traditionally been regarded as altogether different: to be cast outside the jurisdiction within which one was sentenced is often to be separated from rights, privileges and standards otherwise available—to become, to some degree, a "man without a country". In such event, but not otherwise, there may be said to be "grievous harm" requiring constitutional protection.

KILKENNY, Circuit Judge (dissenting).

The atmosphere in the Rhode Island Adult Correction Institution in the fall of 1971, following the bloody uprising in September in the prison at Attica, New York, was one of acute tension and confrontation between militant black inmates and members of the prison staff. Shortly before the transfers, blueprints and materials for making a bomb were found in the prison. Then, the Warden received what he considered reliable information that a plot was afoot. The plot involved two plans of action; one plan calling for the presentation of im-

possible demands to the Warden by the Afro-American Society, the other involving a contemplated seizure of hostages. In the surrounding confusion of this disruption, several inmates would then attempt to escape. This information was obtained from informants and prison personnel. Although there were several versions of the plot and some of them inconsistent, there was little question in the mind of the Warden that there was something behind the rumors. Four of the transferred inmates were white, the rest were black. The black inmates were active in the Afro-American Society. The white inmates who were transferred were suspected of planning to escape. As it turned out, there was a clear mistake as to two of the white inmates. The trial judge found that the transfers were motivated by the stories of a forthcoming prison riot, that the prison officials were of the honest belief that there was a plot, and that their action in transferring the inmates was not arbitrary or capricious. The judge expressed the opinion, however, that the Warden's fear of an imminent prison uprising was not based on reliable evidence.

I am unable to agree with the majority view ". . . that *some* due process is mandated in all transfer cases.", or with the conclusion that ". . . notice of charges or reasons for the action and of the intent to transfer with an opportunity for the inmate to challenge the facts . . ." is a constitutional requirement in all cases where transfer is contemplated. In the circumstances, here presented, a notice of the charges, served on the suspected inmates, might well have triggered the riot which the authorities feared.

It seems to me that the majority has failed to recognize that the consequences of conviction of a crime involve not merely the loss of liberty enjoyable in a free society, but additionally the subsequent impairments which are inevitably associated with membership in a closely supervised prison community. A good faith determination that swift action is

necessary to forestall a riot should substantially outweigh an immediate determination of individual culpability. For that matter, the inherent characteristics of a prison society are such that prison officers must make prompt decisions as problems confront them, and this governmental interest in maintaining disciplined order far outweighs the individual interest in perfect justice. On this record, the alleged autocratic action taken by the concerned officials was an inevitable incident of effective management of the suspected inmates.

At best, due process is flexible and calls for only those procedural protections that the situation demands. Consideration of what procedures due process may require under any given set of circumstances must begin with the determination of the precise nature of the governmental function involved, as well as the private interest that may have been affected by the governmental action. Consequently, even conceding, which I do not, that the action of the authorities, on the record before us, rises to constitutional dimensions, we still must weigh the predictable tragic consequences of an imminent prison riot against the highly restricted personal rights of prison inmates. I find nothing in the guidelines enunciated in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Cafeteria Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), or other Supreme Court cases which I have analyzed, to suggest that, on this type of record, the suspected inmates were entitled to a hearing before transfer.

Although the rules imposed in Morris v. Travisono, 310 F.Supp. 857 (D.R.I. 1970), outline what would appear to be reasonable procedures in every day disciplinary problems, they should not be employed to handcuff prison officials in their efforts to prevent what might well be a bloody prison mutiny. The trial judge concedes that his hindsight observations on the seriousness of the threat are of no consequence.

The transferred inmates do not challenge the validity of the New England Interstate Corrections Compact, under the provisions of which they were transferred. Despite what is said by the majority, transfers without hearings, under such compacts are not *per se* unconstitutional. Hillen v. Director of Dept. of Social Service & Housing, 455 F.2d 510 (CA9 1972), cert. denied 409 U.S. 989, 93 S.Ct. 331, 34 L.Ed.2d 256; Duncan v. Madigan, 278 F.2d 695 (CA9 1960), cert. denied 366 U.S. 919, 81 S.Ct. 1096, 6 L.Ed.2d 242 (1961); Duncan v. Ulmer, 159 Me. 266, 191 A.2d 617 (1963).

I would reverse the judgment of the lower court and dismiss the action.